[Civ. No. 26344. Fourth Dist., Div. One. Apr. 18, 1984.]

DEBRA BETTS, Plaintiff and Appellant, v.
ALLSTATE INSURANCE COMPANY et al., Defendants and Appellants.

690

## COUNSEL

Cornelius P. Bahan, B. V. Yturbide and David W. Graf for Plaintiff and Appellant.

Charles A. Lynberg, Judith Gold, Lynberg & Nelson, Ronald C. Kline, Roy G. Weatherup, Robert L. Washburn, Haight, Dickson, Brown & Bonesteel, Lascher & Lascher, Edward L. Lascher and Wendy C. Lascher for Defendants and Appellants.

Paul H. Cyril, Michael J. Brady, David R. Fuller and Christopher R. Miller as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

**STANIFORTH, J.**—In an earlier (underlying) lawsuit for damages arising out of an automobile intersection accident (Gallucci v. Betts), Anne E. Gallucci obtained a jury verdict-judgment against Debra Betts for damages of $450,000,[1] $350,000 in excess of Betts' automobile insurance policy issued by Allstate Insurance Company (Allstate). Allstate assumed the Betts defense, furnished the law firm of Ruston and Nance (Ruston) to represent Betts in the underlying lawsuit, but flatly denied liability and adamantly refused during the entire course of litigation and up to and including the

---

[1]The total award to Gallucci of $600,000 was offset by Gallucci's comparative negligence set at 25 percent. Thus the net verdict was $450,000.

motion for new trial to accept Gallucci's offer to accept its policy limits in settlement.

In the present action Betts sued Allstate, alleging breach of covenant to deal fairly and in good faith. She charges a "bad faith" refusal to accept a settlement offer within the policy limits. Betts alleges Ruston was negligent in conducting the defense of her lawsuit. A jury returned special verdicts awarding (1) compensatory damages against Allstate of $500,000 (to which the trial court added prejudgment interest and costs) and (2) punitive damages of $3 million. The jury found Ruston was also negligent and awarded $500,000 jointly and severally against the lawyers and Allstate for emotional distress. A motion for new trial was conditionally granted as to the latter $500,000 award of damages unless Betts accepted a reduction of the award of $500,000 to $50,000. Betts accepted that condition and a new trial was denied in its entirety. Allstate and Ruston appeal the respective portions of the judgment against them. Betts cross-appeals the order which conditionally granted the partial new trial.

## FACTS[2]

### The Accident

At 1:30 a.m. on May 8, 1975, 17-year-old Debra Betts collided with a car driven by Anne Gallucci (another Allstate insured) at the signalized intersection of Imperial Highway and La Mirada Boulevard. Betts was alone in the car owned by her father. Witness Pamela Thayer was in the car which followed Gallucci into the intersection. Gallucci suffered severe brain injuries that nearly took her life and rendered her permanently incompetent, unable to relate what had happened. The accident was promptly reported to Allstate by Betts' father who claimed Gallucci had run the red light at the intersection. An employee in Allstate's Downey branch initially rated the case as one of 50-50 liability because it was an intersection collision, but later changed the evaluation to 90-10 against Betts' liability when he received *Mr. Betts'* statement regarding Gallucci's traffic light violation and confirmation of that fact from witness Thayer. Another Downey branch office employee, Robert Myers, was put in charge of overseeing the handling of the Betts file. He originally evaluated the case at 80-20 against liability. He later changed this to 90-10 and then to 95-5 in response to claimed factual data affecting the case and because of Ruston's view. Allstate's home office personnel were of the same opinion: they characterized this case as one of no liability whatsoever and determined it should be approached on a "deny/defend" basis.

---

[2]On this appeal we review the evidence conformable to the long-familiar substantial evidence rules as set forth in *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 821 [169 Cal.Rptr. 691, 620 P.2d 141], and *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].

Allstate referred the Betts case to Ruston, an Orange County litigation firm, to undertake the defense of Gallucci's suit. The first attorney to review the file (Vic Eitel) was of the opinion this was a no liability or a 95-5 percent liability case. Throughout the entire pretrial period the opinion of both Allstate and its counsel was that Gallucci had horrendous injuries that could produce a verdict far in excess of $100,000—up to a million dollars—in the event of a full liability finding against Betts. Allstate agents as fact bases for their "no pay/defend" stance, relied upon Betts' consistent and "patently sincere version of the fact[s]" in which she unwaveringly described her speed as safe, within legal limits, her attitude as attentive, and the green light with her as she entered the intersection.

### The Allstate Investigation—Who Ran the Red Light?

Shortly after the accident, Betts related her version of the accident to the Allstate adjuster who wrote down her answers and prepared a written statement. Betts was never permitted to see or read this statement until the present trial. This statement suggests Betts negligently contributed to the accident in the form of (1) excessive speed and (2) inattention. She reported she had approached the intersection at 40 miles per hour and reduced her speed somewhat, maybe to 35; seeing the light was green she *accelerated* a little bit and entered the intersection. *She did not not notice any cross-traffic* until the Gallucci vehicle was but one car length away from her. The intersection was posted for 40 miles per hour. The supervisor in the local Downey Allstate office reported Gallucci's severe brain damage and pointed out *"it appears that both parties were speeding."* He rated the liability as 50-50.

Thayer told officers at the scene Gallucci ran the red light. Allstate adjuster Santa Maria later took Thayer's statement under suggestive conditions. Thayer was in a hospital under medication. Within a month after the accident, Thayer gave a revised version which contradicted her first statement. She was confused as to where she was, the direction to which she had been traveling and whether she had been stopped or moving. With the change in her story, Allstate came to regard her as "flaky" and "unreliable," unable to substantiate Betts' account.

Allstate immediately hired Truesdale Laboratories, a reputable accident reconstruction firm, to investigate the accident. The author of the first Truesdale report, McElwain, *concluded Betts had been driving at 45 to 50 miles per hour and Gallucci was found to have been wearing a seatbelt and had been traveling 15 to 20 miles per hour on the assumption that she was making a left turn.*

On July 24, 1975, supervisor Myers wrote to Allstate district casualty claims supervisor Majorie Boyce to express his concern over the Truesdale report. He proposed further contacts with the expert *in an effort to change the conclusions concerning Betts' speed, suggesting a mistaken assumption that Gallucci had been making a left turn as a possible basis for change.* Furthermore he scolded Boyce. "This appears to be the type of a report that we would have wanted over the phone orally rather than in written form."

Myers also admitted to knowledge of this damaging fact: *Betts' statement did not tell whether she looked in both directions for cross-traffic before entering the intersection* to check that it was safe even though she may have had the green light. Myers stressed this was most important. He suggested further contact with the insured to *"restatementize her on this key issue."* He concluded with comparative negligence involved, a $100,000 policy involved, and brain damage involved *"we need a little extra effort on this case."* While the liability estimate was changed from 50-50 to 90-10 based upon Thayer's statement and Myers estimated 95-5 exposure, nevertheless on August 12, 1975, Allstate created a $50,000 reserve. Such reserve was felt to be warranted because of the seriousness of the injuries.[3]

With this state of knowledge Allstate ordered a second, then a third Truesdale report. The second differed little from the first. Thus, in spite of Boyce's effort to have Truesdale "review" the entire subject, the second report (authored by McElwain and dated Sept. 3, 1975) again *stated Gallucci was traveling at a lesser rate of speed than Betts.* In short the second Truesdale report refused to say Betts' speed was less than an excessive 45 to 50 miles per hour.

In June 1976 Truesdale was prevailed upon by Allstate representative Strowmatt to issue yet a third report with a new author, Pennycook. Pennycook proposed Betts' rate of speed (estimated by Truesdale's first report at 45 to 50 and unchanged in the second report) might have been as low as 30. *However, Pennycook admitted* to Powers (the Ruston attorney then working on the case) *that a scientifically acceptable basis for the calculation was not possible.* Powers called the defect in the report to Allstate's attention. He described Pennycook's conclusion as not being scientifically supportable. With this as Allstate's state of knowledge concerning the Truesdale findings, Powers interviewed Pennycook and concluded that the two men at Truesdale had so hopelessly "botched" matters as to require employment of another reconstruction firm. Thus the third Truesdale report

---

[3]By November 1975, Allstate claims Attorney Smith and Myers learned Thayer had disappeared, or was inaccessible for deposition.

was also rejected as useless because it was inaccurate and vulnerable to attack by Gallucci. Thereafter from Allstate's head office to the district level the hiding of the Truesdale reports became a focus of activity.

First, Myers reacted by seeking to conceal the Truesdale reports. He proposed the first report be returned to Truesdale for deletion of Allstate's name and any other matters indicating Allstate requested the report. Secondly he suggested a law firm be hired without delay into whose hands the altered report would be placed and thereafter in the event of discovery the law firm would be in a position to assert the work product privilege. Myers said he wanted "the lawyers at Ruston and Nance to claim that they had requested that report and it was attorney work product." Instructions were sent to Boyce to do this precise thing—to alter the report so no one would know that Allstate had asked for it. Ruston's Powers unequivocally condemned the coverup stating "it would be completely wrong; it would be lying; it would be altering a piece of potential evidence; it would be potentially perjury."

In face of the developing evidence of liability, district manager Boyce received a home office directive ordering defense on the basis of *"no negligence—claimant ran red light."* By October 9, 1975, however, Allstate's Myers had begun to question the no liability stance. He wrote to Boyce on another subject with a copy to house counsel Smith to which he added a "blind post script" to Smith's copy. In it he acknowledged Betts' failure to check the intersection before entry as a troublesome fact. He acknowledged as a fact she was traveling some five to ten miles above the speed limit. Myers stressed the fact Betts was speeding and not looking, yet viewed the case as at best a 90-10 exposure. Response from higher officials at Allstate was not long in coming. On November 13, 1975, Smith delivered a written message to Myers followed up by a telephone conference. In essence, the writing said Betts was legally in the intersection and *therefore improper lookout and excessive speed could not be material.* Smith disagreed with the existing reserve of $50,000 or any settlement close to it.

These further facts, critical to any rational evaluation of exposure of Betts, were known to Allstate pretrial. Less than a month after the accident Allstate learned the injuries suffered by Gallucci were most severe. In addition to fractures and contusions the diagnosis included a brain stem injury with coma. Medical costs were already approaching $21,000. Boyce obtained this information concerning Gallucci's costs by a practice known as "backdooring." Gallucci's file was in another Allstate district office being processed for her medical payment coverage under her Allstate policy. Despite Gallucci's husband's express refusal to give authorization to Allstate, their agents went into her records. In an effort to disguise the transfer of

information, Boyce crossed out the file marks identifying it as part of Gallucci's medical payments claim and substituted a styling to indicate the material originated in connection with Gallucci's injury claim against Betts. There was evidence that this misidentification procedure as well as the "backdooring" (invasion of cross-files) was a general practice of Allstate.

### The Gallucci Investigation

Gallucci's attorney John Trotter hired expert Harry Krueper, a respected specialist in accident reconstruction.

Krueper was of the opinion (and so reported Aug. 12, 1976) *on the basis of calculations from data derived from Betts' own deposition and other physical site evidence it was Betts, not Gallucci, who had run the red light.*

For some reason not made clear, an agreement between opposing counsel was reached by which Allstate counsel would not seek to compel production of the basis of Krueper's opinion in exchange for Trotter's cessation of efforts to depose Truesdale's McElwain. Due to the self-confessed negligence, Allstate's trial attorney, Dragonette, when he deposed Krueper, did not ask sufficiently pointed questions to elicit his opinion or its factual basis. Trotter (in the present trial) was of the opinion Ruston and Allstate *must have anticipated Krueper's damaging testimony*; *surprise was only pretextual*; Allstate, of course, learned of Krueper's opinion and its fact basis early in the trial.

At trial the defense was unable to make a showing of any effective rebuttal to the evidence of liability. Defense expert witness Auksmann was admittedly not qualified to challenge Krueper's conclusions or facts. Ruston attorney Powers refused to stipulate to Gallucci's incompetency and therefore lawyer Trotter brought her into the courtroom. The court promptly declared her incompetent. Allstate district claims representative Strowmatt states she was one of the "most pathetic pieces of humanity I've ever observed." In this continuing collapse of the defense position and the overwhelming evidence of an enormous exposure because of Gallucci's injuries, Allstate continued adamant in its no-pay position.

Strowmatt (who had estimated up to 20 percent exposure on the collapse of witness Thayer) admitted (in his deposition in the present action) that after Krueper's testimony the cause was an *excess judgment* case involving potential bad faith. Smith, claims attorney at Allstate's home office, acknowledged Krueper's testimony required a readjustment of the no liability stance and called for a 50-50 allocation. Finally, the two and one-half year no-pay stance was in the face of knowledge of the Allstate officials that

Betts early in the proceeding had made a "slip of the tongue" in her deposition.[4]

With knowledge of all the foregoing facts, the Allstate home office absolutely rejected offers by Gallucci to settle within the policy limits and denied all settlement authority to local representatives. Dragonette recommended payment of the policy limits but was refused authority. After the collapse of witness Thayer, Myers requested settlement authority but was refused (in a July 22, 1977, telephone conversation). Significantly, the contents of this telephone conversation were unrecorded and the written correspondence between home office claims Attorney Thorton and Myers omitted any reference to the discussion.

By the time of Myers' request for authority, the Trotter firm had made two offers to settle within the policy limits. One demand was made orally by Mr. Handweiler on June 8, 1977, the second was made in writing by Mr. Bahan on July 18, 1977. Handweiler's demand for the policy limits was made to Ruston attorney Powers. Powers realized the potential conflict in interest between Betts and Allstate precipitated by this demand. He reported the demand to Allstate *but failed to report it to Betts.* But Bahan's demand letter reviewed the facts pointing to liability of Betts and called attention to the catastrophic nature of the injuries. Powers however stated there was then no evidence of liability warranting a settlement.

Strowmatt then wrote to Betts concerning the demand letter, explaining no offer was made because discovery had not yet been concluded primarily because of the Trotter firm's refusal to cooperate with regard to key witness Thayer. *This statement was at a time, however, when Thayer had already been deposed and had recanted.*

Nineteen-year-old Betts went to Ruston's office to participate in the meeting concerning Bahan's demand. Betts said she relied entirely on Dragonette, Allstate's trial attorney. She had no reason to doubt that he was advising her or making a decision other than in her best interest. She did

---

[4]This was the "slip": Betts testified she had first seen the signal a *half mile* away from the intersection; it was then red, changing later to green. This was a slip for two reasons: the topography was such that it was unlikely if not impossible to see the signal from such distance. Doubt on her credibility, her perception in general, was raised by this impossible assertion. More important, Strowmatt (and expert Krueper) knew these signals did not operate automatically at set intervals but were designed to be actuated on the passage of vehicles over trip pads built into the surface at a point just before entry into the intersection. Thus the light would be green for traffic first activating the signal and therefore red for cross-traffic. Given the circumstances described by Betts it was virtually certain that the light was green for Gallucci and red for Betts long before she came to the intersection. This follows because *the sensing device over which the slower moving Gallucci car passed was further from the intersection than the one in speeding Betts' path.*

not understand the reference to a *settlement* conference nor did she understand what was meant by the Strowmatt letter saying that *her policy limits were being demanded.* At that meeting there was no discussion of a possible conflict of interest arising because of the settlement demand. *Betts was told nothing about the known liability problems arising from the Truesdale findings, Gallucci's employment of a specialist on traffic signals, or Thayer's dismissal,* not as a favorable witness, but *as "a flake."* Betts was not informed of the settlement recommendation of Dragonette and Strowmatt.

The jury could draw a rational inference the lawyers assured Betts she would win at trial. Typical of the statements made to her were: "You had a green light and you got to give that a try. You shouldn't have someone else in the wrong get the money. They're trying to get the money and you had a green light and you should try it. We can win. While we admire you Ms. Betts there is not too many people like you who stand behind what they say and feel the right and take action upon it." Myers recounted Betts and her father had met with the defense attorneys and they "both tell us to try the case." Betts maintained she had done nothing wrong and should *the verdict exceed the limits she would "just file bankruptcy."*

Dragonette signed a letter to the insurance company (actually written by Strowmatt) asserting Betts was *virtually judgment proof.* He noted *her understanding that should the jury not believe her and should a substantial verdict result she would file bankruptcy to discharge the obligation.* Most important to the lawyer was this: Betts was positive she had the green light and the other party was entirely at fault. He stated Betts understood the law of comparative negligence but simply did not feel the accident was one percent her fault.[5]

Pursuant to instructions from Allstate's office, Dragonette's response (Aug. 4, 1977) to Bahan's demands was to continue the "deny/defend" posture of the insured.

A judicial settlement conference was held on August 10, 1977; Allstate refused to *pay one cent in settlement.* The conference occurred without any notice to Betts. Strowmatt was present and the court questioned him at the outset as to any offer. He stated that he had "zilch" or "zip" (no money) to offer. Thereupon the court terminated the conference. Myers made a record suggesting it was *Trotter* who was responsible for the settlement

---

[5]On July 27, 1977, Myers wrote Strowmatt as to a manner in which Ruston should be instructed to reply to the Bahan demand; another blind postscript was added to the copy sent to Thornton *referring to the ongoing efforts to quash the deposition of McElwain even as he was giving directions to Strowmatt concerning a rejection of the settlement demands.*

conference failure; that Allstate had made no offer because of *the court's* thinking that "the plaintiff did not prove her case."

At the Gallucci trial Betts testified in accord with her previous assertions. Based upon Betts' facts, site data and extensive calculation, Krueper demonstrated Betts had violated the traffic signal. Powers conceded, as noted above, after Krueper's testimony, the matter was an excess judgment case involving potential bad faith.

During the course of the trial, Trotter again attempted to settle the claim within policy limits. A deadline of August 10, 1977, or settlement was mentioned in the Bahan demand letter, yet Trotter continued his offer to settle before the jury verdict. At the commencement of the trial and during its progress Powers and Strowmatt realized the policy limits should be offered; they agreed then they did not feel bound by the deadline set in Bahan's letter. They, however, did not explore the subject because they felt settlement authority would not be forthcoming. It would be "academic."

During jury deliberations Trotter approached Powers telling him "I think you're going to lose the case. We will still take the $100,000. Why don't you go call Allstate." Powers said he would call and get back to him first thing in the morning. The next morning Powers said he called Spear, Allstate district claims manager, and informed him of the offer and recommended acceptance. He said, "They don't want to pay anything."

On September 16, 1977, more than two weeks after Krueper's testimony, the jury returned its verdict in favor of Gallucci in the net amount of $450,000.

Immediately after the excess verdict a senior claims attorney for Allstate, Wathen, took over active control of the case from Ruston. Allstate's posture, however, remained the same regarding settlement. At this late date Ruston engaged in a series of acts (which will be explored later in connection with the negligence claim against the Ruston firm), in failing to look after Betts' obligation arising from the excess verdict. For example, Trotter wished, in exchange for an assignment of Betts' rights, to release her from personal liability. Powers advised her not to assign; Trotter was described as the "enemy."

Allstate filed a motion for new trial. Pending its hearing, Allstate failed to explore the possibility of paying the $100,000 limits immediately in exchange for an offer of a full satisfaction. Although initially authorizing $100,000 for that purpose, Allstate lawyer Wathen reversed himself. Wathen feared the money, if offered, would be irretrievably lost in the event the

motion for new trial was granted or Allstate prevailed on appeal.[6] At no time during this period was Betts ever advised by anyone she might have to sue Allstate. Moreover, there was an attempted manipulation of Betts to keep her from seeking independent counsel. *Only after Betts was examined at a debtor's examination by Trotter and his offer to pay the cost of such consultation with an independent attorney did Dragonette give Betts the name of a lawyer to consult.*

In the postjudgment period Allstate attempted to change its files by the inclusion of a suggestion had Allstate known of Krueper's testimony in time the matter would have been settled, but *the opposition's tactics had prevented such knowledge.* After the judgment, Ruston continued to cooperate with Allstate. Powers wrote to Allstate: The verdict was "not supported by the evidence."

DISCUSSION

I

ALLSTATE APPEAL

A.

█ In addition to the duties imposed upon the parties to a contract by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing. (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 818; *Comunale* v. *Traders & Generals Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].) The implied promise requires each contracting party to refrain from doing anything to impair the right of the other to receive the benefits of the agreement. (*Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940 [132 Cal.Rptr. 424, 553 P.2d 584]; *Comunale* v. *Traders & Generals Ins. Co., supra,* 50 Cal.2d at p. 658.) And as was pointed out in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 818: "The precise nature and extent of the duties imposed by such implied promise will depend upon the contractual purposes."

The California Supreme Court in *Comunale* v. *Traders & Generals Ins. Co., supra,* 50 Cal.2d 654, addressed the nature and extent of duties imposed by this implied covenant in liability insurance policies. █ There

---

[6]The good faith of this position may be questioned. An appeal was not seriously considered because a bond would be necessary; in the event of affirmance Trotter would be able to obtain a full satisfaction of judgment without a bad faith lawsuit.

the Supreme Court held an insurer in determining whether to settle a claim must give at least as much consideration to the welfare of the insured as it gives to its own interest. The governing standard is whether a prudent insurer would have accepted the settlement offer if it alone were to be liable for the entire judgment. (See *Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 16 [123 Cal.Rptr. 288, 538 P.2d 744].)

■ An insurer may be held liable for a judgment against the insured in excess of its policy limits where it has breached the implied covenant of good faith and fair dealing by unreasonably refusing to accept a settlement offer within the policy limits. (*Commercial Union Assur. Cos.* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 916-917 [164 Cal.Rptr. 709, 610 P.2d 1038].) Allstate's argument that liability for an excess judgment is not imposed unless there is a "bad faith" breach of the contract is unsound. Liability is imposed "for failure to meet the duty to accept reasonable settlements, a duty included within the implied covenant of good faith and fair dealing." (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 430 [58 Cal.Rptr. 13, 426 P.2d 173].) "[R]ecovery may be based on an unwarranted rejection of a reasonable settlement offer and . . . *the absence of evidence, circumstantial or direct, showing actual dishonesty, fraud, or concealment is not fatal to the cause of action.*" (*Ibid.*, italics added; see also *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032].)

■ The duty to deal in good faith with the other party to the contract of insurance "*is a duty imposed by law, not one arising by the terms of the contract itself.*" (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at p. 574, italics added.) In other words, this duty of dealing fairly and in good faith is nonconsensual in origin rather than consensual.

■ The obligation of good faith and fair dealing requires the insurer to settle a claim in an appropriate case although the express terms of the policy do not impose such a duty. (*Murphy* v. *Allstate Ins. Co., supra,* 17 Cal.3d at p. 941.) *The insurer must settle "within policy limits where there is a substantial likelihood of recovery in excess of those limits.*" (*Ibid.*, italics added.) This duty to settle is implied in law to protect the insured from exposure to liability in excess of coverage as a result of the insured's gamble on which only the insured might lose. (*Ibid.*; *Shapero* v. *Allstate Ins. Co.* (1971) 14 Cal.App.3d 433 [92 Cal.Rptr. 244].) ■ "[I]n deciding whether or not to compromise the claim, the insurer must conduct itself as though it alone were liable for the entire amount of the judgment." (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d at p. 16.)

Thus, the permissible considerations in evaluating the reasonableness of the settlement offer are whether in light of the victim's injury and the prob-

able liability of the insured the ultimate judgment is likely to exceed the amount of the settlement offer. Such factors as the limits imposed by the policy, a desire to reduce the amount of future settlements, or a belief that the policy does not provide coverage do not affect a decision as to whether the settlement offer in question is a reasonable one.

## B.

A key factual question put to the jury was: Were the repeated offers made by the Trotter firm reasonable in the light of all of the circumstances of this case? If reasonable, their rejection by Allstate became unreasonable, therefore imposing on Allstate responsibility for the excess judgment.

The judgment was four and one-half times the offer of settlement. It is a rational inference the value of Gallucci's claim was the equivalent of the amount of the judgment. An acceptance of an offer within the policy limits was a most reasonable method of dealing with her claim.

These conclusions do not just arise by hindsight. There is uncontradicted evidence Allstate, whether blindly or purposefully, accepted the statement of the 17-year-old Debra Betts and upon that basis and that basis alone proclaimed its "no pay/defend stance" and refused to make any offer whatsoever. There was a mountain of available evidence which put Allstate on notice that this was a case of enormous liability. The findings of the Truesdale expert are the most significant. They demonstrate the Allstate prediction of 95-5 exposure had no rational basis.

Allstate failed to question the accuracy and soundness of its own client's conclusion. Gallucci's expert was able to take Betts' exact words and make out a prima facie case for Betts' liability. Betts' first account, if *facts* not conclusions are the measure, would support at least an offer of the policy limits once the enormous Gallucci damages were known. These facts warrant the rational inference of either a wilful or negligent failure by Allstate to investigate the facts surrounding Betts' liability.

In *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 817, it was held an insurer may breach the covenant of good faith and fair dealing by failing to properly investigate its insured's claim. By equal parity of reasoning a failure to investigate and fairly appraise the third party's claim against the insured would breach the covenant of good faith and fair dealing. (*Ibid.*) Allstate's figurative hiding its head in the sand (or hiding adverse reports) is not a law-sanctioned approach to reasonable investigation and performance of its duty.

There is more than substantial evidence to support the jury's conclusion Allstate unreasonably rejected the policy limits offer made on several occasions by Gallucci's attorney. The compensatory money award, the excess over the policy limits plus interest, is affirmed.[7]

## C.

The next question is: Was Allstate's breach of duty accompanied by oppression, fraud and/or malice warranting exemplary damages? In an action for breach of an obligation not arising from contract, Civil Code section 3294, subdivision (a), provides for sanctions by way of exemplary damages "where the defendant has been guilty of oppression, fraud, or malice." The plaintiff, in addition to the actual damages, "may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).)

Under subdivision (c)(1) of the same section, "malice" means "conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others." The term "oppression" means "subjecting a person to cruel and unjust hardship in conscious disregard for that person's rights" (Civ. Code, § 3294, subd. (c)(2)), and the term "fraud" means "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury" (Civ. Code, § 3294, subd. (c)(3); see Johns, California Damages (2d ed. 1977) at pp. 394-395). Thus an insurer's bad faith may not only breach the implied covenant of good faith and fair dealing but also can be treated for tort purposes as a basis for exemplary damages where it occurs in a context of malice, fraud or oppression. (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 817.)

As summarized above, there was more than substantial evidence before the jury to support a finding Allstate had breached its duty to deal reasonably and in good faith with Betts, rendering Allstate liable to pay compensatory damages for all detriments caused by the breach. However, such a determination does not in itself establish Allstate acted with the quality of intent which is requisite to an award of punitive damages. (*Neal* v. *Farmers*

---

[7]Allstate now challenges the sufficiency, competency, adequacy of the Gallucci offers. Allstate summarily rejected these offers without any attempt to seek clarification—it felt them ambiguous or incomplete. Allstate cannot now in good conscience use its own failure to explore the settlement offer as a defense of its own breach of duty to tender the policy limits—exactly what the Gallucci attorneys were willing to accept.

*Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].)

To find the requisite intent for an award of punitive damages, it is necessary to search beyond the facts of (un)reasonable response to those adducing motive and intent. (*Ibid.*) There must be substantial evidence of an intent to vex, injure and annoy, a conscious disregard of the plaintiff's rights, before punitive damages may be awarded. (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103].)

A brief highlighting of the evidence demonstrates the substantial evidence that warranted the jury in making a finding Allstate intended to vex, injure, and annoy. From almost the day of commencement of its duty to represent, defend and indemnify Betts, Allstate adopted an objectively unreasonable "no liability/no pay/defend" stance. This obstinate attitude-intent grew in strength in face of evidence piled upon evidence pointing to liability and ultimately to a verdict far in excess of policy limits.

There is much more here than Allstate's unwillingness to accept its responsibility to defend its insureds. Evidence abounds of an irrational refusal to face up to adverse evidence. The Truesdale reports disclosed Betts liability. The jury could draw a rational inference that Allstate deliberately concealed these adverse reports, not only from the other side but from their own insured.

Attorney Dragonette's failure for some unknown reason to pursue the cross examination of Gallucci's expert to determine his opinion and its fact basis gives rise to a whole series of rational adverse inferences suggesting Allstate's attorneys, as well as Allstate, were unwilling to develop a record which would require abandonment of their "no liability/no pay/defend" policy.

The highly questionable practice of Allstate not putting adverse facts in writing—the "use the telephone" directive—indicates a lack of good faith in dealing with, an intent to vex, injure and annoy, their client. Allstate's disreputable practice of violating its duty to one insured by "backdoor-ing"—examining into the cross-file of another—suggests an intent to defraud or oppress its own clients.

The jury could reasonably conclude Allstate wilfully manipulated its own client through the process of coaching, encouraging a patently unreasonable belief in 17-year-old Betts that she had not run the red light—contrary to a whole series of developing facts. It is a further reasonable inference that Allstate, through its counsel, attempted to instill in Betts the determination,

if there was an excess judgment, to go bankrupt. The posttrial manipulation of Betts again evidences an intent to vex, injure and annoy. The moment of the excess verdict (if not before) there arose a duty to offer Betts independent counsel. Ruston, the Allstate-hired law firm, was at that moment placed in a position of open conflict of interest. Yet neither Allstate nor its attorneys bothered to inform the client. It was not until Betts was examined by opposing counsel, Trotter, at the debtor's examination, that she was advised of the necessity of and thereafter tendered independent counsel.

The foregoing evidence supports a conclusion of callous indifference to, an intent to vex, injure and annoy, its insured. Allstate's counsel, even on this appeal, seek to minimize the disturbing practice by Allstate, claiming "only by a handful of disgruntled former employees" does this evidence appear.

Many of the actions by Allstate could be, with myopic charity, described as negligent failures to investigate the claim against their insured. However, from these same facts a more sinister conclusion appears—an intent to vex, injure and annoy Betts.

Finally, the almost irrational refusal to authorize any settlement even after an excess judgment and denial of a motion for new trial is hard evidence of malice, a willful intent to vex, injure and annoy Betts.

The Supreme Court, in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 820, shed light on the duties owed to an insured in context of a claim of exemplary damages: " '[A]s a supplier of a public service rather than a manufactured product, the obligations of insurers go beyond meeting reasonable expectations of coverage. *The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust.*' [Citation.] Furthermore, the relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position. *The availability of punitive damages is thus compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship.* [Citation.]" (Italics added.)

More than substantial evidence warrants the conclusion that Allstate was guilty of oppression and malice and acted with an intent to vex, injure and annoy and with a conscious disregard of Betts' rights. (*Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452, 462.)

## D.

We turn now to the further question of whether the amount of the punitive damage award ($3 million) is excessive as a matter of law. Certain established principles afford guidance in answering this question, all of which are grounded in the purpose and function of punitive damages. The first factor is the degree of reprehensibility of the conduct of the insurer. We must look at "the nature of the defendants acts in the light of the whole record." (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 928.) Different acts may be of differing degrees of reprehensibility; the more reprehensible the act, the greater the appropriate punishment "other things being equal." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) **(12b)** Here the jury could rationally conclude the conduct of Allstate in this case was highly reprehensible and involved an irrational not based on fact attempt to avoid financial responsibility, a calculated attempt to hide adverse evidence, misadvise the client, place lawyers in a compromising position, all to avoid making any settlement with a severely injured victim.

A second factor is the wealth of the defendant. The award is for the purpose of punishment and for sake of an example. It follows, the wealthier the wrongdoing defendant, the larger the award of exemplary damages must be in order to accomplish the statutory objective. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928.) Where insurance company fraud is found, appellate courts have declared a jury could reasonably make a punitive award equal to "one week's earnings." (See *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-271 [95 Cal.Rptr. 678].) The Supreme Court in *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at page 929, adopted the *Wetherbee* guideline in confirming an award equal to one week's net earnings, saying it was "required to effect the necessary punishment of defendants and serve as an example to all other insurers." The jury award here of $3 million represents less than one-half week's earnings of Allstate.

A third factor in determining "reasonableness" of punitive damages suggests a reasonable relationship be maintained between the punitive and the compensatory damages. (See *Burnett* v. *National Enquirer, Inc.* (1983) 144 Cal.App.3d 991 [193 Cal.Rptr. 206], app. dism. — U.S. — [79 L.Ed.2d 668, 104 S.Ct. 1260].) The cases refer to this requirement as a "yardstick" (*id.,* at p. 1011) or a "useful tool" (*Vossler* v. *Richards Mfg. Co., Inc.* (1983) 143 Cal.App.3d 952, 969 [192 Cal.Rptr. 219]) or a factor upon which to base a presumption the award was the result of passion or prejudice (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 819 [174 Cal.Rptr. 348]). Commentators have found this requirement to be a

"rationalization" to reach a result the appellate court could not otherwise justify. (See Morris, *Punitive Damages in Tort Cases* (1931) 44 Harv. L.Rev. 1173, 1180; Mallor & Roberts, *Punitive Damages: Toward A Principled Approach* (1980) 31 Hastings L.J. 639, 667.)

 A review of recent cases shows courts do not evaluate this particular relationship by a rigid formula but rather by the fluid process of adding and subtracting different considerations: if the defendant's conduct is sufficiently reprehensible, the ratio between compensatory and punitive damages is less important; however, where the ratio of compensatory to punitive damages is extremely high and the conduct is somewhat less reprehensible, this ratio carries more weight. (See *Vossler* v. *Richards Mfg. Co., Inc.*, *supra*, 143 Cal.App.3d 952 [ratio 1.4 to 1]; *Burnett* v. *National Enquirer, Inc.*, *supra*, 144 Cal.App.3d 991 [ratio 3 to 1]; *Rosener* v. *Sears, Roebuck & Co.* (1980) 110 Cal.App.3d 740 [168 Cal.Rptr. 237] [ratio 15.8 to 1]; *Weisenburg* v. *Molina* (1976) 58 Cal.App.3d 478 [129 Cal.Rptr. 813] [ratio 45.2 to 1]; *Neal* v. *Farmers Ins. Exchange, supra*, 21 Cal.3d 910 [ratio 75 to 1].) The proper consideration is whether the punitive damage award bears a reasonable relationship to its principal purpose of punishment and deterrence. As was said in *Zhadan* v. *Downtown L. A. Motors* (1976) 66 Cal.App.3d 481 [136 Cal.Rptr. 132]: "[A] 'reasonable relationship' between the compensatory and the punitive damages involves much more than a simple mathematical comparison . . . [g]iven a fixed amount of compensatory damages, the amount of punitive damages which will serve the purpose to punish the offense and to serve as an example to others will necessarily vary widely . . . . Where the objective of deterrence would not otherwise be served, the wealthy defendant cannot legitimately object to a ratio much higher than that involved in the case at bench." (P. 499.)

E.

 The Allstate argument that the punitive damages must remain in the original ratio of culpability between compensatory and punitive damages as measured by the jury award fails. Such requirement is particularly inapplicable here. Allstate's conduct toward *Betts* was as "reprehensible" as the conduct in any of the cases where judgment was affirmed. The award is not out of line when compared to the defendant's financial resources. The trial judge was directly faced with the arguments now confronting this court. By issuing the one remittitur but not the other the court made an implied finding the punitive award was correct. " '[P]unitive damage awards rendered at the trial level [are] guided by the "historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorable to the judgment, indicates were rendered as the result of passion and prejudice. . . ." [citation]. . . . [A]n appellate

court may reverse such an award "only ' "[w]hen the award as a matter of law appears excessive or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice." ' " [Citation.]' " (*Burnett* v. *National Enquirer, Inc., supra,* 144 Cal.App.3d 991, 1010.) ▮ We decline to hold the jury's award was excessive as a matter of law.

F.

Allstate next asserts instructional errors occurred requiring reversal. The instructions given are the basic standard instructions drawn from BAJI designed to delineate well-established principles involving the breach of implied covenant of good faith and fair dealing and cover as well whether Allstate's breach was accompanied by elements of malice, fraud or oppression warranting exemplary damages.

▮ Separate, distinct and correct instructions were given covering the liability of the lawyer defendants to Betts. As basis for their contention of error Allstate emphasizes a single instruction, failing to consider the instructions as a whole. The instruction complained of is to the effect that the plaintiff would "be entitled to a verdict" if the jury found Ruston "was negligent" and "such negligence was the proximate cause of her injury." Further instructions were given which fully protected Allstate against imputation of liability due to Ruston's negligence; it was made clear Allstate could be held responsible only for the conduct of its officers, directors, agents and employees and that *Ruston did not fall within that group but was an "independent contractor."*

The instructions against Allstate and Ruston involved different legal/factual theories of recovery. The distinction began with instructions concerning different burdens of proof involved. It was continued in the ensuing instructions concerning duties of attorneys on the one hand and duties of insurers on the other and culminated in the instruction that each defendant is entitled to a fair and separate consideration of his or her own defense and "[was] not to be prejudiced by [your] decision as to the other." "[U]nless otherwise stated you will decide each defendant's case separately." We can find no fault with the instructions as given.

▮ Allstate next contends BAJI No. 12.96 misstates the basic test of an insurer's duty. The instruction states in part: whether "a prudent insurance company . . . *with unlimited liability*" would accept the settlement,

etc. Allstate relies on language of *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 429, which used the words "a prudent insurer *without policy limits*" would have accepted the settlement offer, etc. This is a flyspecking distinction without difference. At least one appellate court has used the phrase "unlimited liability" as a synonym for *Crisci's* "without policy limits." (See *Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 872 [110 Cal.Rptr. 511].) The Supreme Court in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, translated the *Crisci* language into liability terms referring to whether the prudent insurer would have accepted the settlement if it alone were to be "liable" for the entire judgment. (At p. 818.) There was no misleading of the jury in any respect by the use of the language of BAJI No. 12.96.

■ Allstate also complains of the refusal to give certain instructions. The trial court gave certain specific instructions, thereby making Allstate's request superfluous. For example, the rules concerning the duty of an insured to accept offers within policy limits were covered in different language by the court in an instruction defining the scope and duty in conformity with settled and correct principles. Allstate was not entitled to have the subjects covered in the particular language of its choice. (*Hyatt* v. *Sierra Boat Company* (1978) 79 Cal.App.3d 325, 335 [145 Cal.Rptr. 47].)

One of Allstate's requested instructions would have erroneously told the jury the liability for breach of implied covenant of good faith and fair dealing is dependent upon a showing of bad faith and substantial culpability. The law is otherwise. (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425.)

■ Lastly, Allstate claims it was deprived, by refusal of instructions, of the possibility of a successful defense on the grounds of bad faith, lack of clean hands, estoppel, inequitable or unconscientious conduct and/or consent on the part of Betts, their insured. The difficulty facing Allstate in requesting such instruction was a total lack of evidence to show unclean hands, estoppel, an unequitable act or bad faith on the part of Betts. To equate Betts' good faith mistaken belief in her innocence with unclean hands, estoppel or bad faith simply finds no support in the evidence. The facts show Allstate encouraged 17-year-old Betts in this erroneous belief in face of evidence pointing to a totally different conclusion. That such instructions were factually inapplicable is supported by Allstate's counsel's admission in the opening brief Betts gave a "patently sincere version of the facts." Betts original unsupportable belief and speed conclusion was furthered by Allstate's process of manipulation in failing to keep her adequately informed. There was no error in the instructions either given or refused.

## II

### THE RUSTON APPEAL

#### A.

Betts sued the Ruston firm, charging these lawyers negligently conducted themselves in defense of the Gallucci personal injury action. The jury awarded $500,000 joint and severally against both Ruston and Allstate for emotional distress (as well as a separate $3 million in punitive damages against Allstate alone). The trial court remitted the $500,000 amount to $50,000 as a condition of not granting a new trial. Ruston appeals the $50,000 judgment.

 Ruston contends in light of the special findings of the jury, judgment must be entered in favor of Ruston. The first issue in the special verdict was posed by this question, "Was defendant Ruston and Nance negligent?" The jury answered, "Yes." Issue number two tendered the question, "Was the negligence of defendant, Ruston and Nance, a proximate cause of the excess verdict being rendered against the plaintiff?" The jury answered this question, "No." Issue number five was the question, "If your answer to issue number one is 'yes,' was the negligence of defendant, Ruston and Nance, a proximate cause of damage to plaintiff for fears, anxiety and other mental and emotional distress?" The jury answered, "Yes."

Thus the jury found the total dollar value of Betts' humiliation, emotional distress, and chagrin amounted to half a million dollars. It also found the conduct of the Ruston lawyers proximately caused, at least in part, that humiliation and emotional distress. The jury was most perceptive. While finding the negligent conduct of Ruston was not a proximate cause of the excess judgment, it found their conduct was so egregious in concert with Allstate as to cause Betts to suffer humiliation, emotional distress, chagrin, worry and nervousness to her damages of $500,000.

 In accepting employment to render legal services, an attorney impliedly agrees to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess, and he is subject to liability for damage resulting from failure so to perform. (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685].) Furthermore, it is an attorney's duty to "protect his client in every possible way," and it is a violation of that duty for the attorney to "assume a position adverse or antagonistic to his client without the latter's free and intelligent consent given after full knowledge of all the facts and circumstances." The attorney is "precluded from assuming any relation which would prevent

him from devoting his entire energies to his client's interest." (*Anderson* v. *Eaton* (1931) 211 Cal. 113, 116 [293 P. 788]; *Klemm* v. *Superior Court* (1977) 75 Cal.App.3d 893, 901-902 [142 Cal.Rptr. 509].)

■ These traditional obligations of an attorney are in no way abridged by the fact that an insurer employs him to represent an insured. Typically, in such a situation, the attorney in effect has two clients, to each of whom is owed a "high duty of care." To the insured, the attorney owes "the same obligations of good faith and fidelity as if he had retained the attorney personally." (*Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 146 [65 Cal.Rptr. 406, 28 A.L.R.3d 368].)

■ Provided there is full disclosure and consent, an attorney may undertake to represent dual interests. However, whether in the insurer-insured context or otherwise, the attorney who undertakes to represent parties with divergent interests owes the "highest duty" to each to make a "full disclosure of all facts and circumstances which are necessary to enable the parties to make a fully informed decision regarding the subject matter of litigation, including the areas of potential conflict and the possibility and desirability of seeking independent legal advice." (*Klemm* v. *Superior Court, supra,* 75 Cal.App.3d at p. 901; *American Mut. Liab. Ins. Co.* v. *Superior Court* (1974) 38 Cal.App.3d 579, 590 [113 Cal.Rptr. 561]; *Lysick* v. *Walcom, supra,* 258 Cal.App.2d at pp. 147-149.)

■ The loyalty owed to one client by an attorney "cannot consume that owed to the other." (*Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 526 [50 Cal.Rptr. 592].) Thus a lawyer who, while purporting to continue to represent an insured and who devotes himself to the interests of the insurer without notification or disclosure to the insured, breaches his obligations to the insured and is guilty of negligence. (*Lysick* v. *Walcom, supra,* 258 Cal.App.2d at pp. 150-152.) Ruston mischaracterizes its duty as the obligation to achieve reasonable settlements before judgment, rather than the wider-reaching lawyer's obligation to exercise due care to protect a client's best interests in all ethical ways and at all stages.

Ruston asserts expert testimony was indispensable to a showing of its breach of duty. ■ Expert testimony is not required to establish legal malpractice in all cases. (*Wright* v. *Williams* (1975) 47 Cal.App.3d 802, 810 [121 Cal.Rptr. 194].) This is not a case in which the question of breach turned on legal technicalities requiring the fine exercise of professional judgment. The issue was simply whether Ruston did or did not abandon Betts' best interests in deference to the conflicting interest of Allstate. The proof on that issue was clear in its inculpatory impact. It speaks for itself without the aid of expert opinion.

Nevertheless, if the law requires expert testimony, there was expert testimony probative of Ruston's breach of duty. The opinions of several lawyers pointed to the wisdom of settlement for policy limits. Although attorney Powers acknowledged the policy limits should have been paid in settlement after Krueper testified and it would have been a "good step" to demand such payment in Betts' best interests, he did not so advise her. Instead he told her not to worry.

Powers and the head of the Ruston firm joined Trotter in testimony to the effect that at minimum Betts should have been advised of her right to consult independent counsel after the settlement demands and certainly after the excess verdict. According to Dragonette and Wathen, Ruston's obligations, after the excess verdict, were owed only to Betts, not Allstate; other attorneys would "likely" have advised Betts to assign to Gallucci or institute her own direct action against Allstate. Trotter condemned the advice to go into bankruptcy as "egregious." That Ruston kept Betts entirely ignorant of essential facts is not disputed.

Ruston admitted to the impropriety of meeting with a representative of the insurer in advance of meeting with the insured; Allstate lawyer Carzoli was of the opinion Ruston should have obtained a waiver from Betts before allowing Strowmatt to attend Ruston's meetings with her after the verdict. The Ruston firm also recognized Betts' best interests required that, while the motion for new trial was still pending, efforts be made to negotiate full satisfaction of the excess judgment by offering the policy limits.

### B.

When the facts are viewed in the light most favorable to the judgment, the record compels affirmance of the finding that *Ruston breached the duty owed Betts in several respects.* The lawyers failed Betts by (1) lack of disclosure and sound advice; (2) after the excess verdict, when the conflict of interest was unmistakeable, actively working to protect Allstate and persisting in manipulating Betts against her own best interests; (3) assisting in manufacturing a false record against the time when a bad faith lawsuit might be instituted; (4) rather than advising consultation of independent counsel as possible or desirable, resisting the efforts of such counsel to become informed when finally retained; (5) discouraging Betts' assignment of rights in exchange for personal release and influencing her instead in the direction of bankruptcy.

General money damages for the negligent infliction of emotional distress are authorized by law. (*Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th

518].) The jury was so instructed and so found. ▮ Does substantial evidence support the jury verdict? Ruston's counsel asked this question on the motion for new trial: "Kline: What in the world is the emotional distress theory [the jury] assessed against Ruston and Nance the result of?"

The shock of the substantial damage judgment alone would be sufficient to uphold a verdict for nervousness, shock, humiliation, chagrin, worry, etc. Betts was 19 years old when this half million dollar judgment was assessed against her. She could reasonably see no possibility of ever being debt free except through bankruptcy. She *was* concerned about her father's house being taken, about losing her car, etc.

Aside from the excess judgment horror, Betts was put through several years of unnecessary harassment, emotional distress, as a result of the various lawyer delicts. This 17-year-old had for over 5 years lived on the edge of a financial volcano. The excess judgment was but a momentary single incident in many years of substantial emotional trauma caused at least in part by the negligent failure of the Ruston firm to attend reasonably to the interests of its client.

Counsel for Ruston was asked "what the damage should be" for the fear, anxiety etc. caused Betts. Ruston's answer "to your specific question— [was] no more than $50,000." Here the reduction from $500,000 to $50,000 was made by the trial court after the response by Ruston's lawyer.

Finally the trial court recognized this was not *mere negligence* in failing to properly depose an expert witness but rather it was *"not the type of conduct to be condoned in the legal profession* as far as this court is concerned." (Italics added.) In short, the host of ethical/legal improprieties in the treatment of Betts caused her emotional damage separate and distinct from the excess verdict trauma and authorize the $50,000 award. We find no legal or factual basis for upsetting the trial court's remittitur of $500,000 to $50,000.

The judgment in all respects is affirmed.

Cologne, Acting P. J., and Butler, J., concurred.

Petitions for a rehearing were denied May 14, 1984, and the petitions of defendants and appellants for a hearing by the Supreme Court were denied June 21, 1984. Lucas, J., was of the opinion that the petitions should be granted.