Filed 12/23/14  Rickey v. Lally CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JEANNE RICKEY,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>DAVID LALLY,<br><br>    Defendant and Respondent. | G049507<br><br>(Super. Ct. No. 30-2012-00585070)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gail Andrea Andler, Judge.  Affirmed.

Law Offices of Michelle D. Strickland and Michelle D. Strickland for Plaintiff and Appellant.

Ng Do-Khanh, Daniel Do-Khanh and Anthony Cartee for Defendant and Respondent.

*        *        *

In December 2007, Jeanne Rickey retained Attorney David Lally to perform legal services on her behalf in regard to the bankruptcy of one of her debtors, contractor James Reed. The retainer agreement was quite explicit; Lally was hired *only* to handle "the Plan Objections in the Chapter 13 case of James Reed." The agreement, in fact, specifically said that *if* Rickey wanted additional work, a separate written agreement would be required.[1]

More than four years later, in July 2012, Rickey sued Lally for legal malpractice. The complaint admitted Lally had indeed, as the retainer agreement contemplated, filed an objection to Reed's bankruptcy plan. It also admitted Lally had also filed a $12,500 proof of claim against Reed based on an arbitration award in Rickey's favor. However, it alleged two omissions on Lally's part: Lally had failed to file a non-dischargeability complaint against Reed in the bankruptcy court, and he had failed to file an amended claim against him based on the "latent defects" inflicted on Rickey's house in the course of a remodeling job for which Reed was responsible. Rickey's theory was that Reed could be held liable for latent defects beyond the initial $12,500 arbitration award, hence there was a need for an amended claim.

Rickey further alleged that after Reed's bankruptcy was dismissed in August 2009, Lally advised her she could "enforce her judgment" against Reed, which somehow caused her to believe, incorrectly, she had a *judgment* she could enforce against him rather than an arbitration award. (There is no question she had an arbitration award, as distinct from a formal judgment.) And she alleged Lally should have informed her she needed to separately prosecute Reed in state court on the latent defects matter, and as a

---

[1] The exact language from the retainer agreement was: "Thank you for providing David Brian Lally (the 'Firm') with the opportunity to provide legal services to you. We have agreed the Firm will provide legal services *only* with respect to handling the Plan Objections in the Chapter 13 case of James Reed. If you desire the Firm to handle additional legal matters, a separate, written agreement will be required." (Italics added.)

result of *not* being so informed, the statute of limitations ran on various tort causes of action she had against Reed.

The case was tried to the court, which, after a full trial, rendered judgment for Lally. The "essential" – the trial judge's word – reason for the defense verdict was that Rickey did not present any expert testimony to establish Lally had violated some duty of care in the advice he gave Rickey or in his failure to file a non-dischargeability complaint or amended claim.

Rickey now appeals from the judgment, focusing on Lally's alleged statement that Rickey could pursue her "judgment" against Reed. Lally admitted at the trial that he had indeed used the word "judgment" in an email telling Rickey that she could pursue Reed in the aftermath of the dismissal of his bankruptcy case.

The general rule, of course, is that expert evidence is a prerequisite to establish a case of legal malpractice. (*Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, 1239 ["In negligence cases arising from the rendering of professional services, as a general rule the standard of care against which the professional's acts are measured remains a matter peculiarly within the knowledge of experts."]; *Wilkinson v. Rives* (1981) 116 Cal.App.3d 641, 648 ["Since there was no such expert testimony, there is no evidence from which the trier of fact could have found negligence on the part of respondent Rives."].) The need for expert testimony has particular force where the attorney, as here, holds himself or herself out as a specialist: "Where, however, the malpractice action is brought against an attorney holding himself out as a legal specialist and the claim against him is related to his expertise as such, then only a person knowledgeable in the specialty can define the applicable duty of care and opine whether it was met." (*Wright v. Williams* (1975) 47 Cal.App.3d 802, 810-811.)

There is an exception, however, to the general rule, namely for malpractice that is *so bad* – that is, so obvious – that expert testimony is not needed. *Goebel v. Lauderdale* (1989) 214 Cal.App.3d 1502 is the lead case embodying this exception, and,

naturally, is the case mainly relied on by Rickey here.  There, a bankruptcy attorney – but one who, nonetheless, still "handle[d] other legal matters" – specifically and affirmatively advised a contractor to collect $15,000 from a job on which he was working even though he himself owed the laborers and material suppliers, and then stop work on the project.  The contractor followed the advice and within about a month filed for bankruptcy.  (*Id*. at p. 1505.)  But there was a big problem with the attorney's advice.  A California Penal Code section makes a contractor's diversion of funds from completing a job a felony.  (*Ibid.*, citing Pen. Code, § 484b.)  When the contractor was subsequently prosecuted for having acted on the bankruptcy attorney's direct advice, the contractor sued the bankruptcy attorney for legal malpractice.  While the contractor *did* have an expert testify at trial against the bankruptcy attorney, that expert was not expert in bankruptcy, and could only testify about attorneys in general.  (*Id*. at p. 1506.)  The case ended in a nonsuit in favor of the defendant.  In reversing the judgment, the appellate court said that the bankruptcy attorney's malpractice was *so clear* no expert was needed.  The court in fact used the "so clear" phrase twice in two successive paragraphs:  once in quoting from *Wilkinson v. Rives, supra,* 116 Cal.App.3d at pages 647-648, and once in delivering its holding (that time without quotation marks).  (*Goebel, supra*, 214 Cal.App.3d at p. 1508.)[2]

What also emerges from reading the *Goebel* opinion is that the substance of the bankruptcy attorney's egregiously bad advice was not only decisive in the court's decision to reverse the nonsuit, but profoundly offended the appellate court:  "Quite simply, respondent advised his client to *break the law*.  We see no problem in concluding that, as a matter of law, such conduct markedly departs from the skill and diligence attorneys commonly possess."  (*Goebel, supra*, 214 Cal.App.3d at p. 1509, italics added.)

---

[2]     The *Goebel* court also framed its test as one of *ready apparency*, i.e., obviousness.  (*Goebel, supra*, 214 Cal.App.3d at p. 1508 [only where "the attorney's negligence is readily apparent from the facts of the case," is expert testimony unnecessary].)

4

The same element of attorney misconduct was similarly present in other no-expert-testimony-needed cases, such as *David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 884 [attorney breach of fiduciary duty] and *Betts v. Allstate Ins. Co.* (1984) 154 Cal.App.3d 688 [attorney disloyalty to client].)

A variation on the "so clear" theme from *Goebel* is the total-absence-of-research on issues clearly bearing on the scope of the attorney's retention, as exemplified in *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070. Ironically, that case also involved a bankruptcy attorney, but one who ended up being the plaintiff and appellant in the subsequent legal malpractice case. In *Stanley*, a bankruptcy attorney was going through a divorce with her doctor-husband, who had a VA pension. She also was herself the recipient of a partnership withdrawal buy-out from her previous law firm. (*Id*. at p. 1083.) Her family law attorney advised her to cede her entire interest in the VA pension as a way to help her stay in her house, despite the fact that even keeping a mere $1 interest in it would have made her eligible for lifetime health insurance at "very low cost." (*Ibid.*) Further, the family law attorney made no provision for the "immediate and specific" tax consequences of the law partnership buyout. (*Id*. at p. 1095.) While there was no expert testimony specifically addressing these matters, the appellate court reversed a trial court nonsuit in their regard. As to the VA pension, the court said just a "few hours" of legal research (or less) would have revealed the existence of a federal regulation allowing her to keep "valuable benefits" if she had maintained even the $1 interest. (*Id*. at p. 1094.) As to the tax liability for the partnership buyout, the court said the lack of research, "coupled" with evidence the family law attorney was "unnecessarily rushing" to finalize a settlement, was enough for the wife's claim to survive the absence of expert testimony. (*Id*. at p. 1095.)

In the case before us, however, neither the *Goebel* "so clear" nor the *Stanley* "total absence of research" test helps Rickey. What is particularly important in this case is the limited scope of Lally's legal work for Rickey, spelled out with great

5

clarity in the retainer agreement, *coupled* with the technical bankruptcy context of Lally's alleged goofs.

*Stanley* is clearly inapposite to the case at hand. In *Stanley* the family law attorney's malfeasances involved not doing any research into two discrete matters – a government pension plan that came with health benefits, and a partnership buyout. Each of these matters bore directly on the division of community, and if a family law attorney is retained to do anything, it is to handle the division of community property in the context of divorce proceedings. Here, by contrast, Lally never agreed to be Rickey's *general* bankruptcy counsel. He was retained for an extremely narrow task, which was filing an objection to a particular debtor's chapter 13 plan.

*Goebel* is likewise inapposite, but it will take a few more paragraphs to explain why. Unlike *Goebel*, this case comes to the appellate court after a full trial, not a nonsuit, and so, unlike *Goebel*, the absence of expert testimony was only the main, but not the exclusive, reason for the trial court's decision. (For example, the trial judge said, on the record, that she found "merit" to the proposition that Rickey had not proved damages within the traditional "case within a case" standard governing legal malpractice actions.) The significance of the procedural difference is this: Unlike *Goebel*, all conflicts in evidence and inferences drawn from the evidence in this case are resolved in favor of the respondent, not appellant.

And one of those items of evidence, impliedly credited by the trial court here, involves Lally's testimony that in bankruptcy proceedings, judgments and arbitration awards are "treated the same." So the question arises: Can we say, as a matter of law, that Lally's free-to-pursue-her-judgment statement was so obviously below *the standard of care of bankruptcy attorneys specifically hired "only" to file plan objections* that no expert testimony was needed to establish the proposition that the statement was below the standard of care.

6

We can't.  This case does not come to us in a vacuum.  The overall circumstances of Lally's "judgment" statement included at least four background factors that tend against any matter-of-law conclusion of *obvious* malpractice:  (1)  The statement was made at a time when Reed's chapter 13 bankruptcy had been dismissed, apparently in part because Reed didn't make payments on the arbitration award, so the focus of the attorney-client relationship was on recovery of the arbitration award, not whatever else Lally might do to extract money from Reed; (2) that arbitration award was the functional equivalent to a bankruptcy attorney of a judgment; (3) Lally's retention was specifically focused on objecting to Reed's chapter 13 plan and, concomitantly, on preventing Reed from getting out of what he *already* owed to Rickey, not on finding ways to assert *new* state law claims against him; and (4) with the dismissal of the bankruptcy, Rickey was back to a situation where there were no obstacles to any state court actions against Reed.  And the point bears repeating:  Rickey did not hire Lally for state court prosecution of all possible claims arising out of Reed's apparently botched job of remodeling, but only to object to his plan in bankruptcy court.

Under the totality of such circumstances, whether Lally fell below the standard of care in using, in the bankruptcy context, the word "judgment" when "arbitration award" would have been more felicitous – or even in earlier not gratuitously doing extra work on the theoretical possibility that Rickey might yet obtain a greater recovery from Reed on some fraud-latent defect theory – is not something *we* have the expertise to ascertain.  None of the members of this panel are bankruptcy experts.  And without expert testimony as to what a bankruptcy lawyer would have been *normally* expected to do under the circumstances, whether Lally's conduct fell below the standard of care is a mystery to us, as it was to the trial court.  That mystery necessitated a judgment for the defense.

The judgment is affirmed.  Lally shall recover his costs on appeal.



BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


FYBEL, J.