**LINCOLN GENERAL INSURANCE COMPANY, Plaintiff,**

v.

**ACCESS CLAIMS ADMINISTRATORS, INC., and Does 1 through 75, inclusive, et al., Defendants.**

**No. CIV. S–07–1015 LKK/EFB.**

United States District Court, E.D. California.

Jan. 22, 2009.

Brian Paul Worthington, Norman A. Ryan, Ryan Mercaldo & Worthington LLP, San Diego, CA, Frederick W. Bode III, Steven W. Zoffer, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, for Plaintiff.

Benjamin T. Erwin, Brian J. Levy, Jessica F. Pardi, Lewis E. Hassett, Morrison Manning & Martin LLP, Atlanta, GA, Mona Hanna, Michelman & Robinson, LLP, Santa Ana, CA, Robert Edmund Davies, Rebecca Ann Weinstein–Hamilton, Caulfield, Davies & Donahue, Sacramento, CA, Barbara J. Mandell, Jeffrey Dean Farrow, Marc R. Jacobs, Michelman and Robinson LLP, Encino, CA, for Defendants.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

This is an action brought by an insurance company, Lincoln General Insurance

Company ("Lincoln"), against its corporate claims administrator, Access Claims Administrators ("Access"), over the alleged mishandling of a claim arising from an automobile accident. Pending before the court is defendant's motion for summary judgment. The court resolves the motion upon the papers and after oral argument.

## I. FACTS [1]

Lincoln brought suit against Access, a claim administrator. Compl. ¶¶ 1–2. Lincoln is an insurance company that writes automobile policies in California and various other states. Defendant's Statement of Undisputed Facts ("Def.'s SUF") ¶ 1. Pursuant to a Claims Service Agreement between the parties, Access administered claims for Lincoln's California nonstandard insurance program. Def.'s SUF ¶ 2. Access, in its capacity as a claims administrator, provided a number of services for Lincoln, including investigating liability and negotiating claims through settlement or final disposition and issuing all claim payments with funds provided by Lincoln; preparing and filing all reports; and coordinating, directing and managing litigation activity. Access' Deposition Exhibit 1 In Support of Defendant's Motion for Summary Judgment ("Claims Service Agreement") at 1–2. In the present action, Lincoln alleges that Access mishandled a claim that arose out of an automobile accident and a subsequent third-party personal injury claim, which Lincoln eventually settled. The complaint alleges three causes of action: (1) breach of contract, (2) breach of good faith and fair dealing, and (3) fraud/intentional deceit.[2]

### A. The Dias Claim

On March 4, 2003, Manuel Coleman and his two daughters, Shyan and Lanisha, were injured in an automobile accident with David and Diana Dias ("the Diases"). Def.'s SUF ¶ 5. As a result of the accident, Diana Dias was rendered a paraplegic, Lanisha Coleman suffered neck and back injuries and Shyan Coleman sustained a head injury. Def.'s SUF ¶ 7. At the time, Coleman was insured under a Lincoln policy (the "policy"). Def.'s SUF ¶ 3. The policy had bodily injury limits of $15,000 per person and $30,000 per accident. Def.'s SUF ¶ 4. Coleman denied liability for the accident because he was rear-ended by a hit-and-run vehicle. Def.'s SUF ¶ 8. Coleman's daughters and the Diases filed claims under the policy. Def.'s SUF ¶ 9. Pursuant to the Claims Service Agreement between Access and Lincoln, Access was to handle the defense of the Diases's lawsuit. Claims Service Agreement at 1, ¶ 4.

In January 2004, Access adjustor Tracy Eggers ("Eggers") was handling the Dias' claim on behalf of Access. Def.'s SUF ¶ 15. Eggers's notes indicate that he concluded that Coleman was 100 percent at fault for the accident. Deposition of Tracy Eggers ("Eggers Depo.") at 70:5–72:25. Eggers set the bodily-injury reserves for David and Diana Dias at the maximum policy limit of $15,000 per person and $30,000 per accident. *Id.* at 32:15–17. Although Eggers does not know the reason, an unknown employee of Access reduced

---

1. All facts are undisputed unless otherwise noted.
 Each party has objected to various pieces of evidence tendered by the other. Some of the evidence to which an objection has been made is irrelevant to the court's analysis of the summary judgment motion. To the extent that the evidence is relevant, the objections

are OVERRULED, except as discussed in note 19, *infra.*

2. The original complaint also alleged causes of action for negligence and negligence misrepresentation, which have since been dismissed. *See* Order, 2007 WL 2492436, Aug. 29, 2007.

the reserves Eggers had set for the Diases to a lower number. *Id.* at 89:10–90:22.

## B. The Diases' Demand Letter

Lincoln alleges that on October 8, 2003 the Dias' attorney, Gary Dolinski, sent a letter to Eggers asking whether Coleman's daughters were making a claim for injuries as a result of the car accident with the Diases. Lincoln's Deposition Exhibit 8 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement. Dolinski wrote Eggers on several subsequent occasions, following up on the issues raised in the October 8 letter and complaining that no one had responded to him. Lincoln's Deposition Exhibits 9, 10, 11 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement; Deposition of Gary Dolinski ("Dolinksi Depo.") at 15–21.

On January 20, 2004, Dolinski prepared a time-limited joint demand for the full $30,000 policy limits for both Diana Dias and David Dias. Def.'s SUF ¶ 10. The demand letter included a ten-day deadline requiring a response by January 30, 2004. Def.'s SUF ¶ 11. Access did not respond to the January 20 demand letter prior to close of business on January 30, 2004. Access' Deposition Exhibits 138A, 139 In Support of Defendant's Motion for Summary Judgment; Dolinski Depo. at 28:12–15. On January 30, 2004, Dolinksi's firm faxed two letters to Access discussing the time-limited settlement demand ("the January 30 Letters"). Access' Deposition Ex. 138A, 139. The first letter was faxed in the afternoon, stating:

> It is now 5:00 p.m. E.S.T., your time on the East Coast ... Access General and Lincoln General had (sic.) Until *today at 5:00 p.m., P.S. T., our time here in California* ... Absent timely acceptance of the policy limits demand today, Lincoln General will be responsible for

the entire verdict that my clients are awarded in this case ... Again, this demand expires *TODAY AT 5:00 P.M. WEST COAST TIME.* Unless it is timely accepted as instructed in my letter of January 20, the demand will not be renewed again.

Access' Deposition Ex. 138A (emphasis in original). The second letter was faxed after 5:00 P.M. Pacific Standard Time on the same day. The second letter stated, "We are writing now to confirm that since you did not accept the demand, the demand has expired. If your understanding is other than above, please so advise me, immediately." Access' Deposition Ex. 139.

Eggers has testified that although he was ill during part of January 2004, he came to work for portions of each workday for that month to keep abreast of claim-related mail. Def.'s SUF ¶ 16. Eggers testified that he did not receive the demand letter or follow-up correspondence. Eggers Depo. at 96:10–98:15. According to Lincoln, a fax confirmation shows successful transmission of both the demand letter to Access on January 20, 2004 and the first of two letters sent on January 30, 2004. Access' Deposition Ex. 139 at D00479–480. Access, however, has tendered evidence that Dolinski had no personal knowledge of the delivery of the demand letter or January 30, 2004 letters and could not testify that the letters were accurately faxed. Dolinski Depo. at 22:13–22, 29:18–24, 57:21–58:13.

To buttress its contention that Access received the letters, Lincoln offers evidence that the demand letter and the January 30, 2004 letters were produced by Access when Lincoln demanded Access' claims file for the Dias claim and the subsequent Dias lawsuit. Declaration of Brian P. Worthington, In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement ("Worthington

Decl.") ¶¶ 9–10. Access adjustor Sally Walsh also saw the January 20 Demand Letter and the January 30 letters in Access' claims file for the Dias claim sometime before the settlement of the Dias lawsuit. Deposition of Sally Walsh ("Walsh Depo.") at 13:9–18:15. Finally, Lincoln notes that on February 10, 2004, Eggers wrote Dolinksi stating, "I apologize for any delay in evaluating documents submitting by your office. I have been out of the office with a series of illnesses ... I expect to be able to address your faxes and calls by the end of the week." Lincoln's Deposition Exhibit 15 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement.

## C. Access's Communications With the Diases's Counsel

The Diases took the position that Lincoln, through Access, "opened" the $30,000 limit on the policy by failing to respond to the demand letter.[3] Def.'s SUF ¶ 19. On February 11, 2004, a lawyer in Dolinski's firm, Joseph Carcione, wrote to Access that, "Because no one at [Access] replied to Mr. Dolinski's policy limits demand in a timely manner, California law provides that Lincoln General will be responsible for whatever the verdict is that my clients are awarded in this case." Lincoln's Deposition Exhibit 17 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement. Eggers testified to having received this letter. Eggers Depo. at 101:14–102:3. Even though Eggers received this letter, he has no recollection of corresponding or attempting to contact Dolinski or Carcione before May 20, 2004. *Id.* at 101:14–104:15. Moreover, Eggers never told Dolinski that Access had not

received the January 20 Demand Letter. Dolsinki Depo. at 29:7–17.

Eggers wrote to Carcione on May 20, 2004 requesting documentation of the Dias' injuries. Eggers Depo. at 104:20–23. In that letter, Eggers did not ask Carcione to clarify what he was referring to in his February 11, 2004 letter when he stated that no one at Access had timely replied to Dolinski's Demand Letter. *Id.* at 104:24–107:6. Access has been unable to produce or locate a copy of this May 20, 2004 letter. Worthington Decl. ¶ 11.

Eggers wrote Dolinski's firm another letter on July 8, 2004 seeking the "status as to demand packages for [Dolinski's] clients." Lincoln's Deposition Ex. 16 In Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. This letter does not mention that Access had never received a policy limits demand from Dolinski's firm. *Id.*

## D. Dias Litigation

Although the Diases's attorney purportedly sent the demand letter to Access on January 20, 2004, Lincoln claims it first heard about the claim at the end of January, 2005, a year later. Kirk Decl. ¶¶ 2–3; see also Def.'s SUF ¶ 37.

Per the Claims Service Agreement between Lincoln and Access, Access was required to "coordinate, direct and manage litigation activity" to Access. Claims Service Agreement at 1, ¶ 4. In addition, Access was responsible for "assigning defense" to an attorney chosen from an approved legal counsel list subject to Lincoln's control. Access maintains that they properly retained California lawyers for Lincoln. They hired Attorney James

3. The court understands the term "opened," to refer to a situation when an insurance company may become liable for an amount in excess of its policy limits arising from the insurer's breach of its duty of good faith by failing to accept reasonable settlement offers. *See PPG Industries, Inc. v. Transamerica Ins. Co.,* 20 Cal.4th 310, 315, 84 Cal.Rptr.2d 455, 975 P.2d 652 (1999).

Haigh to provide an opinion for Lincoln as to whether the policy limits had opened. Def.'s SUF ¶ 40. Lincoln used Haigh's brief in the Second Mediation, to argue that the policy limits had not opened. Def.'s SUF ¶ 41. In addition, Access hired law firm Tharpe & Howell to defend Coleman. Def.'s SUF ¶ 42.

Lincoln chose not to continue with any counsel provided by Access and instead retained attorney Clark Burnham to evaluate Lincoln's exposure in the Dias lawsuit. Plaintiff's Statement of Undisputed Facts ("Pl.'s SUF") ¶ 38. Burnham advised Lincoln that a "probability" exists that they "would face an excess exposure" and stated "this is a case you want to settle." Deposition of Clark Burnham ("Burnham Depo.") at 66:5–18, 68:6–14. Lincoln wrote Access on January 25, 2005 maintaining that because of "Access' poor or improper handling of the [Dias] claim" they expected to be "reimbursed all funds above the policy limits." Lincoln's Deposition Exhibit 54 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement at 3. Lincoln wrote Access again on February 2, 2005 noting that they expected Access to control the litigation in the Dias matter and asking "What specific amount, if any, does Access plan on having available for settlement purposes on the 7th? … It is the position of Lincoln that any extra contractual exposure is the responsibility of Access and/or Access' E & O carrier." *Id.* at 1.

The Diases eventually demanded $10 million to settle their claim. Def.'s SUF ¶ 20. Lincoln sent letters prior to the mediation of the Dias claim demanding Access' attendance, that they be "prepared to resolve this case" and "seeking [Access'] input." Lincoln's Deposition Exhibits 82, 93 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement. Lincoln has tendered evidence that despite its request, Access provided no defense strategy to Lincoln and Access representatives attended the Dias mediation with no authority to offer any money toward settlement. Kirk Depo. at 94:19–95:24; Deposition of Jerry Morris ("Morris Depo.") at 51:10–52:16. Lincoln asserts that Access offered nothing towards the settlement of the Dias lawsuit beyond "help with regards to the defenses to be used in the upcoming trial." Deposition of Michael Meadows ("Meadows Depo.") at 213:20–25.

The Dias lawsuit was mediated on March 10, 2004, with both representatives from Access and Lincoln present, and again on March 28, 2004, with only Lincoln's representatives in attendance. Def.'s SUF ¶¶ 27, 29. Lincoln claims to have excluded Access from the second mediation because "Access was not willing to offer money toward any settlement, and because Lincoln had already asked for Access' input on settlement strategy but had received no response." Pl.'s SUF ¶ 47.

Lincoln settled the Dias claim on March 30, 2005 for $3.8 million, to "mitigate its exposure and protect its insured from personal liability." Declaration of Tim Kirk In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment Lincoln ("Kirk Decl.") ¶ 9. Access contends that it was not consulted about this settlement. Def.'s SUF ¶ 32.

### E. The Diases' Products Liability Lawsuit

On March 3, 2005, the Diases filed a products liability lawsuit (the "Products Lawsuit") against Billings Chevrolet–Geo, Inc., General Motors Corp., and Les Schwab Tire Centers of California, Inc. Tuff County, Inc. was later added as a defendant to the products liability suit. The lawsuit sought damages for the injuries sustained by the Diases as a result of

the auto accident with the Colemans. Def.'s SUF ¶¶ 45, 47. Lincoln chose not to pursue any claims against the defendants in the products liability lawsuit. Def.'s SUF ¶ 49. The products lawsuit settled out of court for an undisclosed amount.[4] Def.'s SUF ¶ 48.

## F. Lincoln's Reinsurance

Lincoln is a party to several reinsurance agreements, through which it has received $498,000 from Kingsway Reinsurance Corporation of Barbados and $1,890,000 under a clash reinsurance agreement with Kingsway and Chubb Reinsurance, Inc. Def.'s SUF ¶¶ 50–51. Lincoln also had a separate Loss Portfolio Transfer Agreement ("LPTA") with Kingsway. Def.'s SUF ¶ 52. Access and Lincoln dispute whether Lincoln received any reimbursement for the Dias settlement or the costs of defending Coleman under the LPTA. *See* Declaration of Gary Orndorff In Support of Pl.'s Opp'n to Mot. for Summ. J. ("Orndorff Decl.") ¶¶ 2–6; Orndorff Depo. at 40:13–41:6. Access has tendered evidence, however, that "100 percent" of whatever recovery Lincoln is awarded in the instant suit would go to its reinsurers under either the reinsurance agreement, the clash reinsurance agreement, or the LPTA. Orndorff Depo. at 40:13–41:6.

## II. SUMMARY JUDGMENT STANDARD UNDER FEDERAL RULE OF CIVIL PROCEDURE 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcast-*

*ing System,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Jung v. FMC Corp.,* 755 F.2d 708, 710 (9th Cir.1985); *Loehr v. Ventura County Community College Dist.,* 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

---

**4.** Pursuant to the court's order and the July 1, 2008 protective order in this case, the amount of the settlement of the Diases' products liability suit has been sealed.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575; *Strong v. France*, 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir.1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 290, 88 S.Ct. 1575; *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller*, 368 U.S. at 468, 82 S.Ct. 486; *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)); *Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd*, 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## III. ANALYSIS

■ Access has brought a motion for summary judgment against Lincoln for the remaining three causes of action: (1) breach of contract, (2) breach of good faith and fair dealing, and (3) fraud/intentional deceit. The court considers each in turn.

### A. Breach of Contract

■ A cause of action for breach of contract includes four elements: that a contract exists between the parties, that the plaintiff performed his contractual duties or was excused from nonperformance, that the defendant breached those contractual duties, and that plaintiff's damages were a result of the breach. *Reichert v. General Ins. Co.*, 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968); *First Commercial Mortgage Co. v. Reece*, 89 Cal. App.4th 731, 745, 108 Cal.Rptr.2d 23 (2001). Here, the parties appear not to dispute that a contract existed between them and that Lincoln fully performed under the contract. Instead, the dispute centers on whether Access breached and, if so, whether Lincoln suffered damages as a result.

Lincoln has alleged that Access breached the Claims Agreement in two ways:

a)By failing to properly investigate liability, damages and coverages; evaluate, negotiate claims through settlement or final disposition; and issue all

claim payments with funds provided by Lincoln General; and

b)By failing to properly prepare and file all reports and handle all claims in accordance with established claims procedures and California Department of Insurance guidelines.[5]

Compl. ¶ 21. The court considers each allegation in turn.

#### 1. Access' Failure to Respond to the Diases' Demand Letter

##### a. Evidence of Breach

The pertinent provision of the contract between Lincoln and Access requires that Access "Investigate liability, damages and coverages, evaluate, negotiate claims through settlement or final disposition ..." Claims Service Agreement at 1, ¶ 1. The crux of Lincoln's first allegation for breach of contract is that Access failed to respond, in any way, to the Diases' January 20, 2004 Demand Letter and that failure constituted a breach of this provision of the contract, as well as exposed Lincoln to a claim for "bad faith liability" brought by Coleman.

■ Under California law[6], "[i]f contractual language is clear and explicit, it governs." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). Contracts should be interpreted by their plain language, unless doing so would result in an absurd construction. Cal. Civ.Code § 1638. The entire contract should be read together as a whole, giving effect to every part. *Id.* § 1641. When a contract has been re-

---

**5.** Plaintiff also alleged that defendant breached the contract "by failing to properly coordinate, direct and manage litigation activity." Compl. ¶ 21(c). In its opposition to defendant's motion, plaintiff does not address this ground for its breach of contract claim. The court therefore assumes that it has abandoned this ground for the claim.

**6.** As the court explained in its August 29, 2007 order, California law applies to all disputes arising from the relationship between Access and Lincoln, unless the construction or interpretation of the contract were at issue, in which case Pennsylvania law would apply.

duced to writing, the intent of the parties should be ascertained by the writing alone. *Id.* § 1639.

Lincoln has tendered some evidence from which a jury could find that Access breached the contract by failing to respond to the Diases' January 20, 2004 Demand Letter. Preliminarily, there is some evidence that Access in fact received the demand letter. First, Lincoln notes that there are fax confirmations for the January 20 letter and for the first of the two follow-up letters faxed on January 30, 2004. Access Deposition Ex. 139 at D00479–480. The fax confirmations could lead a reasonable factfinder to believe that they were received by Access' office. Second, in January 2005, when an agent of Lincoln's was conducting an audit of Access' files, he saw the Demand Letter and the two January 30, 2004 follow-up letters in the Dias claim file. Kirk Decl. ¶¶ 2–3. Access adjustor Sally Walsh also saw the three letters in the Access claims file sometime before the Dias lawsuit settled. In addition, the three letters were in the documents Access produced because of this lawsuit, when Lincoln demanded Access' file from the Dias claim. Worthington Decl. ¶¶ 9–10.

Third, Lincoln notes that on February 10, 2004, Access claims agent Tracy Eggers sent a fax to the Dias' attorney, stating that he had been sick and apologizing for the "delay in evaluating documents submitted by your office," and saying he would "address your faxes" that week. Lincoln Deposition Ex. 15. Lincoln notes that the next day, Carcione sent a letter to Eggers stating that the latter had failed to reply to the Demand Letter. Lincoln's Deposition Ex. 17. Despite alleging never to have received the Demand Letter, there is nothing to indicate that Eggers called or wrote to the Dias' attorneys to say he had never received it. Indeed, neither of the two subsequent letters sent by Eggers, on May 20, 2004 and July 8, 2004, mentioned that Access had never received the Demand Letter. Eggers Depo. at 101–105; Lincoln's Deposition Ex. 16. Lincoln states that a reasonable juror could infer from this that Eggers had received the demand letter, because he otherwise would have indicated to Carcione that he had not received it.

Access, however, has tendered evidence that it never received the Diases' demand letter and therefore did not breach the contract by failing to act on it. To support this, Access cites the deposition of Tracy Eggers, who testified in his deposition that, "I can't remember seeing [the demand letter] any time before [the morning of May 8, 2008] and I can pretty much say I didn't see it before the 10th [of February, 2004] because it's not noted that there was a demand on the policy." Eggers Depo. at 96:1–9. Eggers testified that he also had no recollection of ever seeing the follow-up letters of January 30, 2004 prior to the morning of the deposition on May 8, 2008. Eggers Depo. at 96:15–97:11.

In addition, Access argues that the Diases' attorney "had no personal knowledge of the delivery of the demand letter or the follow-up correspondence [and] had no evidence Access Claims received the TLD or follow up correspondence," because the attorney himself had not faxed the letters. Def.'s Mot. Summ. J. at 11:24–12:1.

With the evidence provided by Lincoln and the deposition of Tracy Eggers tendered by Access, it is clear that there remains disputed facts as to whether the Demand Letter was received by Access. A reasonable factfinder could credit Eggers' testimony, that he did not receive the Demand Letter, and thus, this is fundamentally a question of credibility left to the factfinder. On the other hand, a reasonable jury could find that there is suffi-

cient circumstantial evidence that Access did receive the January 20, 2004 and January 30, 2004 letters, including the fax confirmations, the fact that these letters were later seen in Access' file, and that Eggers appeared unfazed by Carcione's reference to them in February 2004. Moreover, the fact that the Diases' attorney himself did not fax the letters does not alone warrant a grant of summary judgment in Access's favor; a reasonable jury could find that the fax confirmations were adequate evidence of the faxes having been sent. The evidence tendered is sufficient to permit a jury to draw reasonable inferences in Lincoln's favor. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Diebold*, 369 U.S. at 655, 82 S.Ct. 993; *Abramson*, 594 F.2d at 208.

### b. Evidence of Damages

■ Lincoln also has tendered evidence that this alleged breach exposed Lincoln to "bad faith liability," constituting damages for the breach of contract claim. In its relationship to the insured, an insurer has a duty to accept a reasonable settlement demand within the policy limits as part of the covenant of good faith and fair dealing intrinsic to that contractual relationship. *Commercial Union Assur. Cos. v. Safeway Stores, Inc.*, 26 Cal.3d 912, 916–17, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980); *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 659, 328 P.2d 198 (1958). Failure to do this risks subjecting the insurer to a "bad faith" claim. *Crisci v. Security Ins. Co.*, 66 Cal.2d 425, 430, 58 Cal.Rptr. 13, 426 P.2d 173 (1967); *Comunale*, 50 Cal.2d at 659, 328 P.2d 198. Once the insurer's "bad faith" has been established, the insurer must pay portions of the judg-

ment exceeding those expressed in the policy limits.[7] *PPG Industries, Inc. v. Transamerica Ins. Co.*, 20 Cal.4th 310, 315, 84 Cal.Rptr.2d 455, 975 P.2d 652 (1999); *Commercial Union*, 26 Cal.3d at 916–17, 164 Cal.Rptr. 709, 610 P.2d 1038.

■ Ignoring a policy-limits demand letter, without exploring the details of the offer in any way, constitutes bad faith by an insurer. *Allen v. Allstate Ins. Co.*, 656 F.2d 487, 490 (9th Cir.1981) (applying California law). Even if the settlement offer is unclear, an insurer may act in bad faith by failing to seek clarification of the uncertainty. *Betts v. Allstate Ins. Co.*, 154 Cal. App.3d 688, 708, 201 Cal.Rptr. 528 (1984). Similarly, an insurer may act in bad faith if it fails to investigate a claim against the insured, so that it may evaluate the reasonableness of a settlement offer. *Id.* at 707, 201 Cal.Rptr. 528; *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 818, 169 Cal.Rptr. 691, 620 P.2d 141 (1979).

Here, Lincoln has tendered evidence that would permit a reasonable jury to find that Access's failure to timely respond to the demand letter or at least seek clarification of any uncertainty, exposed Lincoln to bad faith liability in excess of the policy limits. As described above, Lincoln has tendered evidence that the demand letter was sent to Access on January 20, 2004 seeking a settlement totaling $30,000 and requesting a response no later than January 30, 2004. Def.'s SUF ¶¶ 10, 11. There is evidence that Access received these letters but did not respond to them. Lincoln has tendered evidence that a reasonable insurer "would have recognized that such

---

**7.** Were the Diases to obtain a judgment against Coleman in excess of the policy limits, the Diases could then recover on Coleman's bad faith liability claim against Lincoln, by becoming a judgment-creditor and third-party beneficiary to Coleman's insurance policy by operation of law. *Hand v. Farmers Ins. Exch.*, 23 Cal.App.4th 1847, 1858–59, 29 Cal. Rptr.2d 258 (1994); *Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 942–44, 132 Cal.Rptr. 424, 553 P.2d 584 (1976).

letters [demand letter and follow-up letters of January 30, 2004] created the potential to open the policy limits unless there was a timely and correct response." Lincoln's Deposition Exhibit 250 (Report of Lincoln's Claims–Handling Expert) In Support of Pl.'s Opp. to Def.'s Mot. for Summ. J. at 11.

■ Access is incorrect in asserting that the law does not support a finding of bad faith in such situation. The California courts have been clear that bad faith liability exists to induce an insurer to protect the insured's financial interests with the same diligence as it would its own; the insurer's conduct need not be grossly irresponsible or unreasonable to trigger bad faith liability. *See, e.g., Betts,* 154 Cal. App.3d at 707, 201 Cal.Rptr. 528; *Comunale,* 50 Cal.2d at 659, 328 P.2d 198. Given this, a jury could reasonably find that if Lincoln's evidence is credited, Access' action or inaction exposed Lincoln to bad faith liability in excess of the policy limits.

■ Moreover, the court cannot agree with Access's suggestion that the settlement demand was unreasonable as a matter of law, because it was excessive for Diana Dias, it was unsupported with the Diases' medical records, it did not release liens for the medical bills or attorneys' fees, and because it left no consideration for the claims of the Coleman daughters. *See* Def.'s Mot. for Summ. J. at 27. The reasonableness of a settlement offer is to be evaluated in light of the victim's injuries and the probable liability of the insured. *Johansen v. Cal. State Auto. Assn.,* 15 Cal.3d 9, 16, 123 Cal.Rptr. 288, 538 P.2d 744 (1975). Here, there is evidence that Diana Dias was left a paraplegic by the accident, Def.'s SUF ¶ 7, and that Access

concluded that Coleman was 100 percent liable for the accident. Eggers' Depo. 70:5–72:25. Access now asserts that the demand was unreasonable because the Coleman policy was a $15,000/$30,000 policy. This contention fails in light of Access's failure to respond at all, much less its failure to seek clarification. *See Betts,* 154 Cal.App.3d at 708, 201 Cal.Rptr. 528. Moreover, given the circumstances, it is likely that the Diases would have argued the husband's loss of consortium, thus satisfying the reasonableness of their demand. These facts alone could lead a jury to reasonably conclude that Access's failure to respond to a settlement offer of $30,000 was unreasonable. Summary judgment is therefore inappropriate as to this portion of the plaintiff's claim of breach of contract.

**2. Access' Failure to Comply With Applicable Claims–Handling Statutes and Regulations**

■ Lincoln's second ground for its breach of contract claim is its allegation that Access breached the Claims Agreement by failing to handle the Dias claim in compliance with applicable claims-handling statutes and regulations. *See* Compl. ¶ 21. The Claims Agreement required Access to "[p]repare and file all reports and handle all claims in accordance with established claims procedures and state guidelines, assuring compliance with the Fair Claims Practice Act, California Insurance Frauds Prevention Act and all other applicable statutes and regulations."[8] Claims Service Agreement at 1, ¶ 2.

**a. Violation of California Regulations**

Lincoln alleges first that Access violated the California Insurance Regulations,

---

8. Although elsewhere in its briefing, Access argues that the choice of law provision in the contract requires application of Pennsylvania law, it does not argue that relevant California statutory and regulatory requirements were not integrated into the contract via this provision.

thereby violating the contract. Specifically, Lincoln alleges that Access failed to comply with the following regulation:

Upon receiving any communication from a claimant, regarding a claim, that reasonably suggests that a response is expected, every licensee shall immediately, but in no event more than fifteen (15) calendar days after receipt of that communication, furnish the claimant with a complete response based on the facts as then known by the licensee.

10 CCR § 2695.5(b) (2005). Lincoln asserts that Access violated this regulation by not responding to the Diases' demand letter within fifteen days of its receipt. As described above, Lincoln has tendered sufficient evidence that Access received the demand letter and failed to respond to it. Nevertheless, Lincoln has not shown how Access's failure to respond to it within fifteen calendar days caused any damages to Lincoln. Lincoln's theory of the case is that the policy limits were opened by Access's failure to respond to the demand letter within ten days, as set forth in the letter; as such, Access's violation of the deadlines set forth by this regulation did not cause the harm that Lincoln purports to have suffered. Consequently, defendant's motion is granted as to this aspect of Lincoln's cause of action.[9]

### b. Violation of Insurance Code

■ Lincoln also alleges that Access violated California's statute barring unfair methods of competition and unfair and deceptive acts or practices in the business of insurance, specifically by,

(h) Knowingly committing or performing with such frequency as to indicate a general business practice any

of the following unfair claims settlement practices: ...

(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

CAL. INS.CODE § 790.03. Lincoln alleges that after Access had determined that Coleman (the insured's) liability to the Diases had become reasonably clear, Access, as Lincoln's agent, failed to effectuate in good faith a prompt, fair, and reasonable settlement.

■ Access first argues that Lincoln's reliance on this statute is inappropriate, as the statute does not authorize a private right of action. See Tricor Cal., Inc. v. Sup. Ct. Los Angeles County, 220 Cal. App.3d 880, 269 Cal.Rptr. 642 (1990). This argument is unpersuasive. Lincoln has not brought a cause of action under the statute but rather alleges that the statute's requirements were integrated into the contract and that, by violating them, Access breached the contract. This is a viable theory to support a breach of contract cause of action. See, e.g., Moradi–Shalal v. Fireman's Fund Ins. Cos., 46 Cal.3d 287, 304–305, 250 Cal.Rptr. 116, 758 P.2d 58 (1988).

Access also argues that Lincoln cannot show that Access violated the statute. The court disagrees. Lincoln has tendered evidence that would permit a reasonable jury to conclude that Access had determined that Coleman was "reasonably clear[ly]" liable to the Diases and that Access did not act in good faith to effectuate a "prompt, fair, and equitable settlement." See CAL. INS.CODE § 790.03(h)(5). The notes of Access's claims representative, Tracy Eggers, indicate that he concluded that Coleman was 100 percent at

---

9. Of course, if Access were to assert that the ten day demand was unreasonable, the fifteen days required by the regulation would become relevant. Access has not made such a claim.

fault for the accident. Eggers Depo. at 70:5–72:25. Although Access argues that Eggers' testimony is equivocal in this regard, it is undisputed that the notation "Named insured is 100 percent liable for all damages in accident" appeared in Eggers' notes in the claim file. *Id.* at 70:9–16. A jury could reasonably conclude that this is adequate evidence that Access had determined that it was reasonably clear that Coleman was liable for the accident. Additionally, as explained above, a reasonable jury could also conclude that Access acted improperly by failing to respond to the Diases' demand letter and, in so doing, obviated Lincoln's opportunity to settle the claim "prompt[ly], fair[ly], and equitabl[y]." *See* CAL. INS.CODE § 790.03(h)(5).

In sum, as Lincoln's agent in the claims handling process, Access was responsible for addressing the Dias settlement proposal on behalf of Lincoln. *See* Claims Service Agreement at 1 ¶ 1. Lincoln has tendered evidence that Access's conduct was such that a reasonable jury could conclude it violated Insurance Code § 790.03, thereby violating the terms of the contract. As discussed above, Lincoln has also tendered evidence that this mishandling caused its damages. Access's motion is therefore denied as to this aspect of Lincoln's breach of contract claim.

### c. Violation of "Established Claims Procedures"

▆▆▆ Finally, Lincoln has alleged that Access violated "established claims procedures" in its handling of the Dias settlement demand. It appears that the contract did not set forth claims procedures distinct from those established by regulation and statute. *See* Claims Service Agreement at 1 ¶ 2; 2 ¶ 17; Appendix B. Although the Claims Services Agreement purported to integrate practices and procedures set forth in an "Administrator's Claim Manual," it appears that that manu-

al was never included in the contract, perhaps unintentionally. *See* Claims Service Agreement 2 ¶ 17, App. B. Because there is no evidence tendered to the court as to what additional claims procedures the contract required of Access apart from those set by California law, the court grants defendant's motion to the extent that plaintiff's breach of contract claim relies on an allegation that Access failed to comply with such additional claims procedures.

### B. Breach of Covenant of Good Faith and Fair Dealing

▆▆▆ There is implied in every contract a covenant of good faith and fair dealing that neither party will act in a way to compromise the rights of the other to receive the benefits of the contract. *Merritt v. J.A. Stafford Co.,* 68 Cal.2d 619, 68 Cal.Rptr. 447, 440 P.2d 927 (1968); *Brown v. Superior Court of Los Angeles County,* 34 Cal.2d 559, 564, 212 P.2d 878 (1949). The covenant imposes on each party not only the duty to avoid acting in a way that compromises the performance of the contract, but also the duty to do everything that the contract assumes they will do to bring about its purpose. *Harm v. Frasher,* 181 Cal.App.2d 405, 417, 5 Cal.Rptr. 367 (1960). The covenant exists to protect the "purposes and express terms of the contract" and not a general public policy interest unrelated to the agreement. *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 690, 254 Cal.Rptr. 211, 765 P.2d 373 (1988).

▆▆▆ Though there appears to be a split of authority, the majority of courts hold that a breach of the covenant occurs when a party engages in objectively unreasonable conduct, "regardless of the actor's motive." *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.,* 2 Cal.4th 342, 373, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992); *see also Neal v. Farmers*

*Ins. Exchange,* 21 Cal.3d 910, 922 n. 5, 148 Cal.Rptr. 389, 582 P.2d 980 (1978); *Badie v. Bank of America,* 67 Cal.App.4th 779, 796, 79 Cal.Rptr.2d 273 (1998); *Lazar v. Hertz Corp.,* 143 Cal.App.3d 128, 141, 191 Cal.Rptr. 849 (1983). Deliberately dishonest conduct is not required for the covenant to be breached, nor is it required that a specific term of the contract be breached. *Carma Developers,* 2 Cal.4th at 373, 6 Cal.Rptr.2d 467, 826 P.2d 710.

■ Additionally, "bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty." *R.J. Kuhl Corporation v. John L. Sullivan,* 13 Cal.App.4th 1589, 1602, 17 Cal. Rptr.2d 425 (1993), citing Rest.2d Contracts § 205, com. d. In *R.J. Kuhl,* a real estate brokerage sued their client and a third party buyer for breach of contract due to failure to pay a commission. *Id.* The buyer had engaged in a side real estate transaction with a third party which resulted in him gaining an unfair economic advantage. *Id.* The trial court ruled in favor of the brokerage, and the appeals court affirmed, holding that the client's obligation to pay the commission was subject to the covenant of good faith and fair dealing. *Id.* at 1593, 17 Cal.Rptr.2d 425. The appeals court noted the following examples of bad faith that have been recognized by the courts: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id.* at 1602, 17 Cal.Rptr.2d 425. The court held that although the defendant honestly believed he was permitted to avoid paying commission to his broker, it was objectively unreasonable conduct, thereby breaching the covenant. *Id.* at 1604, 17 Cal.Rptr.2d 425.

Access argues that other courts have held that a breach of the good faith covenant requires scienter:

> [that] ... demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party ...

*Careau & Co. v. Security Pacific Business Credit, Inc.,* 222 Cal.App.3d 1371, 1395, 272 Cal.Rptr. 387 (1990). This rule has been followed by some federal district courts. *See Hougue v. City of Holtville,* 2008 WL 1925249 at *4 (S.D.Cal. Apr. 30, 2008); *Nava v. VirtualBank,* 2008 WL 2873406 (E.D.Cal. July 16, 2008). However, it appears to be the minority position in California and is contradicted by the California Supreme Court's holdings. *See Carma Developers,* 2 Cal.4th at 373, 6 Cal.Rptr.2d 467, 826 P.2d 710 ("Nor is it necessary that the party's conduct be dishonest.... the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive."); *Neal,* 21 Cal.3d at 922 n. 5, 148 Cal.Rptr. 389, 582 P.2d 980 ("The terms 'good faith' and 'bad faith' as used in this context ... are not meant to connote the absence or presence of positive misconduct of a malicious or immoral nature."). The court therefore declines to follow the *Careau* court.

Plaintiff alleges nine instances of breach of the covenant of good faith and fair dealing:

> a) failing to timely and properly respond to Ms. Dias' policy limit demand letter;
>
> b) failing to request an extension of time to properly respond to Ms. Dias' policy limit demand letter;

c) failing to institute and establish adequate policies and procedures to ensure proper response to policy limit demands when claim handlers were sick on leave;

d) failing to properly instruct and supervise claim handlers in the proper steps to take in such circumstances;

e) failing to notify Lincoln General of the Dias claim even though Access considered the claim to encompass high exposure;

f) failing to pay the policy limits into the appropriate Court;

g) failing to notify Lincoln General immediately upon learning that Ms. Dias' counsel intended to proceed with negotiations without regard to the policy limits;

h) failing to obtain legal counsel to adequately represent the interests of Lincoln General;

i) failing to secure a court decision regarding the legal efficiency of Ms. Dias' alleged demand beyond the policy limits.

Compl. ¶ 27. In its opposition to defendant's motion, Lincoln condenses these nine alleged breaches into two general categories: Access' failure to act with diligence in its discretionary power to handle claims by (1) failing to report to Lincoln that its conduct exposed Lincoln to bad-faith liability; and (2) respond to the demand letter or otherwise handle the Dias Claim appropriately. Pl.'s Opp'n to Mot. for Summ. J. at 20–23. The court considers each of these in turn.

### 1. Access' Failure to Inform Lincoln that Access Exposed Lincoln to Bad–Faith Liability

Lincoln contends that if Access's failure to respond to the demand letter is found to not have breached a term of the contract, Access nevertheless breached the covenant of good faith and fair dealing by failing to inform Lincoln that Access's conduct may have exposed Lincoln to bad faith liability.

Access responds to this with several arguments. First, it argues that the evidence is insufficient to permit a reasonable fact-finder to conclude that Access received the demand letter. As explained above, there is adequate evidence tendered to permit this conclusion.

 Second, Access asserts that its reporting duties, as outlined in the Claims Agreement § 1 and Appendix A to the Agreement, do not require Access to disclose to Lincoln allegations of bad faith claims handling. This is unpersuasive, as the covenant of good faith and fair dealing encompasses discretion vested in a party beyond that which is expressly delineated by the contract's terms. The California courts have rejected an interpretation of the covenant that would limit it to breaches of the contract itself. See *Harm*, 181 Cal.App.2d at 417, 5 Cal.Rptr. 367. Here, the contract vested Access with the responsibility, broadly, to handle claims against Lincoln and investigate the latter's liability with regard to claims. Claims Service Agreement at 1 ¶ 1. The purpose of this arrangement was for Access to act in a manner that fairly limited Lincoln's exposure to liability. By failing to inform Lincoln that Access had received but not timely responded to a request for settlement of the Dias' claim, a jury could reasonably find that Access acted in a way that impeded Lincoln's purpose in entering the contract, notwithstanding that there was not an explicit reporting requirement contained in the contract.

 Third, Access argues essentially that it was Lincoln's own lack of diligence that caused any damages it suffered, because Lincoln had "full and frequent access to information regarding all claims, including the Dias claim" per the Claims Service Agreement. Mot. for Summ. J. at

16. This appears to the court to be an argument of comparative fault, which would not bar plaintiff's recovery for defendant's breach of the covenant. See *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 828–29, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975). Regardless, Lincoln has tendered unrefuted evidence that the purpose of the audit was not to inform itself of particular development in specific cases, but to "review best practices [and] ... trends." Kirk Depo. at 67:5–20. In this light, a reasonable factfinder could conclude that Access's failure to inform Lincoln of its non-response to the demand letter caused Lincoln's damages, notwithstanding Lincoln's authority to audit the file.

■■■ Finally, Access argues that it did not cause any of Lincoln's damages because Lincoln knew of the Dias claim three months before the Dias trial and failed to take any action, such as filing for declaratory judgment or an interpleader action, in the Dias suit. Though Lincoln does not contest the fact that it knew about the Dias claim at least three months before the start of trial, it argues that an interpleader or declaratory relief could not have been filed and completed in that time. Lincoln argues if they had been told about the Dias claim at an earlier date, not only could they have filed appropriate litigation, but they also would have been able to better evaluate whether to involve themselves in the Diases' subsequent products liability lawsuit.

Like the defendant's previous argument, this does not appear to present a complete defense to Access's potential breach of the covenant of good faith and fair dealing. Even if a jury were to find that Lincoln was remiss in not filing an interpleader action or for declaratory relief, there is no certainty that either of these efforts would have been successful. Moreover, as Lincoln observes, even if Lincoln filed an interpleader action, it still was exposed to liability in excess of the policy limits and would still have had to defend Coleman in the Dias suit. *See Mt. Hawley Ins. Co. v. Fed. Sav. & Loan Ins. Corp.*, 695 F.Supp. 469, 474 (C.D.Cal.1987).

Defendant's motion for summary judgment is therefore denied as to plaintiff's claim for breach of the covenant of good faith and fair dealing to the extent described above.

### 2. Access' Failure to Handle the Dias Claim Appropriately

■■■ The Claims Service Agreement established a relationship between Access and Lincoln by which the former was responsible for handling all claims against the latter for the implied purpose of limiting Lincoln's liability. As explained in the previous section, Access's failure to respond to the demand letter could be found to violate the covenant of good faith and fair dealing, as doing so exposed Lincoln to excess liability, undermining Lincoln's very interest in entering the contract.

Moreover, Lincoln has tendered evidence that Access mishandled the Dias claim in other ways. Lincoln's claims-handling expert described the condition of the Dias file up until January of 2004, when the Demand Letter was allegedly sent to Access:

> We are not 10 months into the claim and no real investigation has been done and no one at Access demonstrates an awareness of this or a concern that they have a liability case involving a negligence free passenger in the other vehicle who was made a paraplegic in the accident at issue. This is totally unacceptable conduct and fails to conform to Industry Custom and Practice and for the Standard of Care to which Mr. Coleman and Lincoln are entitled to expect.

Lincoln's Depo. Ex. 250 at 9. There is evidence in the record that the Dias' attorney tried to contact Eggers on numerous occasions and his correspondence was not replied to. Lincoln's Deposition Exhibits 9, 10, 11 In Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J.; Dolinski Depo. at 15:6–21:14. Were a jury to credit this evidence, it could reasonably find that it constituted a breach of the covenant of good faith and fair dealing. *See R.J. Kuhl,* 13 Cal. App.4th at 1602, 17 Cal.Rptr.2d 425 (breach of the covenant includes "lack of diligence and slacking off").

In sum, Lincoln has presented evidence that would permit a jury to reasonably conclude that Access breached the covenant of good faith and fair dealing by its poor handling of the Dias claim and it failure to inform Lincoln of its potential exposure as a result. For this reason, Access' motion for summary judgment on the breach of the implied covenant of good faith and fair dealing claim is denied.

### C. Fraudulent Concealment

■■■ In its final cause of action, Lincoln alleges that Access fraudulently failed to disclose the following from Lincoln: 1) that Access had not timely responded to the demand letter or sought an extension and that the Diases consequently sought a settlement in excess of the policy limits; 2) that it did not have adequate procedures when a claims handler was out sick; 3) that the Diases had made a claim against Lincoln and that Access had not set a "proper" reserve amount for the claim; 4) that it had not paid policy limits "to the appropriate court" nor secured "a court decision regarding the legal efficiency of Ms. Dias'" claim; and 5) that it did not retain counsel to adequately represent Lincoln's interests.

■■■ In order to succeed on a claim for fraud, the plaintiff must show "(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance, and (e) resulting damages." *Agosta v. Astor,* 120 Cal.App.4th 596, 603, 15 Cal.Rptr.3d 565 (2004).[10] Access challenges the viability of Lincoln's claim on several grounds, which the court considers in turn.[11]

First, Access argues that there is insufficient evidence that the demand letter was received. As explained above, the evidence tendered is sufficient to create a genuine issue of material fact on this issue.

Second, Access takes issue with Lincoln's allegation that Access concealed from Lincoln that it had failed "to establish a proper reserve even though Access considered the (Dias) claim to encompass high exposure." Compl. ¶ 37(e). Access argues that it had no authority to set the reserve values above the policy limits.

■■■ A reserve is a sum of money set aside to pay a claim, with the purpose of guarding against insurer insolvency. The Supreme Court has explained,

---

**10.** Access raises for the first time in its reply brief on the argument that Pennsylvania law applies to Lincoln's claim for fraudulent concealment. It is not proper for the court to consider new arguments raised in a reply. *Von Brimer v. Whirlpool Corp.,* 536 F.2d 838, 846 (9th Cir.1976). Furthermore, the court held in its August 29, 2007 order that California substantive law applies to all disputes arising out of Lincoln's and Access's relationship, with the narrow exception of questions of the interpretation or construction of their contract.

**11.** In its reply brief, Access raised for the first time the arguments that there is no evidence of intentional concealment or actual reliance. Again, it is improper for the court to rely on arguments that were not timely raised. *Von Brimer,* 536 F.2d at 846.

The term "reserve" or "reserves" has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, variously computed or estimated, which, with accretions from interest, is set aside—"reserved"—as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment.

*Maryland Casualty Co. v. United States,* 251 U.S. 342, 350, 40 S.Ct. 155, 64 L.Ed. 297 (1920). The reserve value, therefore, should accurately reflect the insurer's potential loss on a claim. *See, e.g., Shade Foods, Inc. v. Innovative Products Sales and Marketing, Inc.,* 78 Cal.App.4th 847, 883, 93 Cal.Rptr.2d 364 (2000).

Here, Access argues that it had no authority to set the reserve on the Dias claim at a value greater than the policy limits. *See* Claims Service Agreement at 1 ¶ 5 ("The Administrator shall ... [e]stablish initial reserves and adjust them accordingly for potential exposure, considering value and liability.... The Administrator will have no ... reserve authority in excess of the limit of liability on the insurance policy which is triggered by the claim."). This apparently misunderstands Lincoln's theory of the claim, which is that Access set the reserves lower than the policy limits, for the purpose of concealing Lincoln's potential exposure for the claim and, allegedly, Access's claim mishandling. *See* Eggers Depo. at 89:10–90:22 (claims file reflects that someone set the reserve at lower than the $30,000 policy limit, after Eggers had set it at $30,000). The evidence tendered suffices to create a genuine issue of material fact on this issue.

 Third, Access contends that even if it did mishandle the Dias claim, it had no duty to disclose this to Lincoln and therefore cannot be liable for fraudulent concealment. Under California law, a defendant can only be liable for fraudulent concealment where it had a legal duty to disclose the concealed fact. *Buckland v. Threshold Enter., Ltd.,* 155 Cal.App.4th 798, 807, 66 Cal.Rptr.3d 543 (2007); *Lingsch v. Savage,* 213 Cal.App.2d 729, 735, 29 Cal.Rptr. 201 (1963). Access, however, had a statutory duty to send a copy of the claims file to Lincoln as soon as it was aware that the claim had the potential to exceed the policy limits. Cal. Ins.Code § 769.83(g). This statutory duty was expressly integrated into the Claims Service Agreement.[12] Claims Service Agreement at 2 ¶ 19. Consequently, as a matter of law, Access had a duty to disclose the Dias claim to Lincoln and, as soon as it was aware of Lincoln's potential bad faith liability, to forward a copy of the claim file, which would alert Lincoln as to Access's handling of the claim. Access' motion therefore fails in this regard.

Fourth, Access argues that if it mishandled the Dias claim, it did not have a separate duty to disclose this to Lincoln, as there is no legal duty for an actor to disclose its intentional tort. *See LiMandri v. Judkins,* 52 Cal.App.4th 326, 339, 60 Cal.Rptr.2d 539 (1997) (holding that the same conduct could not be a basis for both a claim for intentional interference with

---

12. Despite Access's characterization to the contrary, neither the deposition of Timothy Kirk nor his e-mail correspondence to Access (Depo. Ex. 54) suggest that Insurance Code § 769.83(g)'s reporting requirements were not integrated into the contract. On the contrary, the evidence Access cites indicated Mr. Kirk's displeasure with Access that this reporting had not been done. *See* Kirk Depo. vol. 1 54:3–17, 63:4–64:6; Depo. Ex. 54 at 2–3.

prospective economic advantage and intentional interference with contract). This seems entirely inapplicable to the instant case. Lincoln's fraudulent concealment claim does not allege that Access improperly failed to disclose that it intended to commit a tort, but that, *inter alia*, it failed to disclose its inadequate claims handling procedures and its mismanagement of the Dias claim. Access' argument is therefore unavailing.

■ Fifth, Access argues that Lincoln became aware of the Dias claim in January 2005 and could have filed an interpleader action or for a declaratory judgment prior to trial. As explained above, this may be true but offers no grounds on which to grant summary judgment in Access' favor.

Finally, Access asserts that Lincoln's claim must fail to the extent that it alleges that Access failed to obtain legal counsel to represent Lincoln's interests. *See* Compl. ¶ 37(h); Claims Service Agreement at 1 ¶ 4 ("The Administrator shall ... coordinate, direct and manage litigation activity, assigning defense to approved legal counsel subject to Client's control.") The undisputed evidence establishes that Access did obtain legal counsel for Lincoln. Def.'s SUF ¶¶ 40–43. There is also evidence that Lincoln was not displeased with the representation provided by counsel obtained through Access. *See* Kirk Depo. vol. 2 at 233, 237. Lincoln's theory instead appears to be that Access fraudulently concealed the fact that it had obtained inadequate counsel for Lincoln. Lincoln rests this theory on its contention that Access's delay in notifying Lincoln of its exposure in the Dias suit inhibited Lincoln from "eval-

uat[ing] the case against [other] defendants and pursu[ing] other options." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 25. This is not evidence of the inadequacy of the counsel obtained by Access for Lincoln, but rather relates to Lincoln's allegation of Access' underlying mismanagement of the Dias claim and the alleged effect it had on Lincoln's litigation position with regards to that claim. Access' motion is therefore granted on subpart (g) of Lincoln's claim of fraudulent concealment.

**D. Effect of Lincoln's Settlement, Rather Than Adjudication of Liability, on Access's Obligation to Indemnify**

■ Access argues that Lincoln cannot recover against it on any of its causes of action because a party that settles cannot later seek indemnification, since there has been no determination of legal liability.[13] The court disagrees.

■ California has long applied the rule that when there is an agreement to indemnify for liability, the party seeking indemnification need not wait for judgment against it, but may be indemnified for payments made in satisfaction of a settlement. *See Mabie & Mintz v. B & E. Installers*, 25 Cal.App.3d 491, 101 Cal.Rptr. 919 (1972); *Pac. Tel. & Tel. Co. v. Pac. Gas & Elec. Co.*, 170 Cal.App.2d 387, 338 P.2d 984 (1959); *cf. Crawford v. Weather Shield Mfg., Inc.*, 44 Cal.4th 541, 559, 79 Cal. Rptr.3d 721, 187 P.3d 424 (2008) ("One can only indemnify against 'claims for damages' that have been resolved against the indemnities, i.e., those as to which the indemnitee has actually sustained liability

---

13. Access contends that this is true under both California and Pennsylvania law, although urges the court to apply the latter. In its August 29, 2007 order, the court determined that Pennsylvania law only applies to the interpretation or construction of the contract's terms, but not to any other dispute arising out of the parties' relationship. Order, Aug. 27, 2007, at 12–15. California law regarding indemnification therefore applies here.

*or* paid damages." (emphasis added)). In order to be indemnified, "[w]hen the indemnitee settles without trial, the indemnitee must show the liability is covered by the contract, that liability existed, and the extent thereof." *Mel Clayton Ford v. Ford Motor Co.* 104 Cal.App.4th 46, 54, 127 Cal.Rptr.2d 759 (2002) (citing *Peter Culley & Assoc. v. Sup. Court,* 10 Cal. App.4th 1484, 13 Cal.Rptr.2d 624 (1992)). The settlement amount constitutes a "volunteer" payment only when the indemnitor shows that the indemnitee unreasonably paid too much in the settlement, *id.* at 58, 127 Cal.Rptr.2d 759; *see also Pac. Tel. & Tel.,* 170 Cal.App.2d at 392, 338 P.2d 984, or otherwise entered into the settlement in bad faith.[14] *Peter Culley & Assoc.,* 10 Cal.App.4th at 1497, 13 Cal.Rptr.2d 624 ("The settlement is presumptive evidence of liability of the indemnities and of the amount of liability, but it may be overcome by proof from the indemnitor that the settlement was unreasonable (e.g., unreasonable in amount, entered collusively or in bad faith, or entered by an indemnitee not reasonable in the belief that he or she had an interest to protect)."). The court declines to follow *New Hampshire Indemnity Co. v. Professional Claim Services, Inc.,* No. D051230, 2008 WL 5115084 (Cal. Ct.App. Dec. 5, 2008), to the extent it reached a contrary holding, as its holding appears inconsistent with the great weight of authority of the California courts and, in any event, according to the California Rules of Court is not intended to carry precedential force. *See* Cal. Rule of Court 8.1115.

Access misconstrues the holding of *Safeco Ins. Co. v. Superior Court,* 71 Cal. App.4th 782, 84 Cal.Rptr.2d 43 (1999), in its attempt to convince the court that there must be a judgment entered against the indemnitee before indemnification can be sought. In *Safeco,* the court confronted a claim by an insured against its insurer for refusal to settle his claim. *Id.* at 788–89, 84 Cal.Rptr.2d 43. The court held that if an insurance company refuses to settle, the insured (or the party to whom the insured has assigned his rights) may only bring an action for bad faith refusal to settle after a judgment has been rendered in excess of the policy limits. *Id.* The court explained that this is based on the logic that if the insurer refuses to settle and then secures a judgment below the settlement offer, the insured has no claim for "bad faith." *Id.* This holding has no bearing on the case at bar, where Lincoln is not alleged to have refused in bad faith to settle Coleman's claim, and it certainly does not stand for the broad proposition that an "insured being provided a defense does not have a bad faith claim prior to excess judgment," as Access purports. *See* Def.'s Brief In Support of Mot. for Summ. J. at 29–30.

In its reply brief, Access also argues that Lincoln cannot seek indemnity for settling the Dias claim, because the Dias claim was brought against Coleman, not Lincoln. As such, Access argues, there is no evidence of Lincoln's liability to the Diases, sufficient to trigger Lincoln's duty to settle. Even assuming this argument was timely raised, it is wholly unpersua-

---

14. Access' argument that Lincoln's payment was voluntary to the extent that it exceeded the difference between the Diases' settlement demand and the amount the Diases later received from the defendants to the Diases' product liability suit holds no force. Lincoln's settlement with the Diases occurred in May 2005 whereas the defendants to the other suits settled in November 2005 and February 2007. *See* Access' Deposition Exh. B–C. Although the amount of these settlements may be evidence of the reasonableness of Lincoln's settlement, it does not establish the unreasonableness of the settlement value as a matter of law.

sive. Lincoln was not a mere bystander in the action brought by the Diases against Lincoln's insured. As explained supra, Lincoln would be liable for at least some portion of the judgment obtained against Coleman, particularly where the mishandling of the Diases' settlement offer had opened the policy limits. *See Travelers Cas. & Sur. Co. v. Sup. Court,* 126 Cal. App.4th 1131, 24 Cal.Rptr.3d 751 (2005). Moreover, as Coleman's insurer, Lincoln had a legal duty to make a reasonable effort to settle the Diases' claim against him. *See e.g., Lehto v. Allstate Ins. Co.,* 31 Cal.App.4th 60, 67–68, 36 Cal.Rptr.2d 814 (1994) ("the implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose such a duty" (citation omitted)); *Cancino v. Farmers Ins. Group,* 80 Cal. App.3d 335, 340, 145 Cal.Rptr. 503 (1978) (as part of the covenant of good faith and fair dealing with the insured, an insurer must make a good faith effort to settle a claim against the insured within the policy limits). In other words, to the extent that Access is arguing that Lincoln's settlement was unreasonable because it did not have a legal interest to protect, *see Peter Culley & Assoc.,* 10 Cal.App.4th at 1497, 13 Cal. Rptr.2d 624, Access is plainly wrong.

 Indemnification is also triggered when the indemnitor failed to discharge its duty to provide a defense to the indemnities. Although Access attempts to draw a distinction between an indemnitor's duty to indemnify and its duty to defend the indemnitee, California law conceives of these duties as intimately related. By statute, a contractual promise to indemnify includes the promise to reimburse the indemnitee for the costs of its defense. Cal. Civ.Code § 2778(3). Furthermore, when the indemnitee requests it, the indemnitor must provide the defense. *Id.* § 2778(4).

The indemnitor's refusal to do so is conclusive in an indemnification action against it. *Id.* § 2778(5); *see also Crawford,* 44 Cal.4th at 555–57, 79 Cal.Rptr.3d 721, 187 P.3d 424; *Pac. Tel. & Tel.,* 170 Cal.App.2d at 392, 338 P.2d 984. In that situation, the settling party is entitled to indemnification, so long as it has made a good faith settlement. *Pac. Tel. & Tel.,* 170 Cal.App.2d at 392, 338 P.2d 984. In contrast, if the indemnitor offers a defense but is not allowed by the indemnitee to control the defense, this is not a bar to the latter's indemnification. *See* Cal. Civ.Code § 2778(6).

Here, the contract between Lincoln and Access contained an indemnification provision by which each party agreed to indemnify the other for "all claims, loss, liability, costs, damages and reasonable attorney's fees incurred ... as the direct or indirect result of any misconduct, instructions, error or omission of the other ...." Claims Service Agreement at 3, Section III. The contract also provided that Access would "coordinate, direct and manage litigation activity" and "negotiate claims through settlement." *Id.* at 1 ¶¶ 1, 4.

As explained thoroughly *supra,* Lincoln has tendered evidence that through the handling of the Dias claim, Lincoln was exposed to liability in excess of the Coleman policy limits. It is also undisputed that Access determined Coleman to be 100 percent at fault for the Diases' damages. In light of this evidence, Access has not borne its burden to show that the settlement into which Lincoln entered was unreasonable or otherwise in bad faith. *See Pac. Tel. & Tel.,* 170 Cal.App.2d at 392, 338 P.2d 984; *Peter Culley & Assoc.,* 10 Cal. App.4th at 1497, 13 Cal.Rptr.2d 624; *see also* 39A California Jurisprudence 3d § 543 (question of reasonableness of an insurer's settlement is typically a question

of fact best entrusted to a jury, collecting cases).

Additionally, there is evidence that Access did not discharge its duty to Lincoln to provide a defense to the Dias suit. The evidence is equivocal in this regard, but certainly sufficient to defeat Access's motion. On one hand, as described *supra,* Access did provide Lincoln legal counsel for Lincoln and Lincoln was not displeased with the representation provided by counsel obtained through Access. *See* Def.'s SUF ¶¶ 40–43; Kirk Depo. vol. 2 at 233, 237. There is also some evidence that Lincoln barred Access from participating in portions of the settlement negotiations. Kirk Depo. vol. 2 at 245:6–17. On the other hand, Lincoln has tendered evidence that Access participated in only a limited fashion in the settlement negotiations. *See* Morris Depo. at 51:4–16; Kirk Depo. vol. 1 at 94:19–95:24; Kirk Depo. vol. 2 at 245:6–17; Burnham Depo. at 182:8–22. A factfinder could thus reasonably conclude that Access did not discharge its duty to provide a defense to Lincoln when requested, and therefore that Lincoln is entitled to indemnification so long as its settlement was reasonable. *See* Cal. Civ.Code § 2778.

## E. Lincoln's Reimbursement for Its Losses

 Finally, Access contends that Lincoln has been reimbursed for its losses related to the Dias claim and therefore cannot recover against Access. The court does not agree.

## 1. Lincoln's Reinsurance Agreements

The parties do not dispute that Lincoln's reinsurers possess subrogation rights in a recovery against Access, and that these rights exist both by operation of law and expressly through Lincoln's contracts with its reinsurers. *See Progressive West Ins. Co. v. Sup. Court,* 135 Cal.App.4th 263, 272, 37 Cal.Rptr.3d 434 (2005). It is also undisputed that Lincoln has been reimbursed via its reinsurance agreements for a total of $2,388,000. It seeks damages for this amount (and more, since it seeks to recover the entire $3,800,000 settlement and other damages), but Lincoln claims that this would not constitute double recovery because the $2,388,000 will be repaid to the reinsurers. The dispositive issue, therefore, is whether Lincoln has the right to sue in its own name for the purpose of enforcing its reinsurers subrogation rights.

California courts have held that a party that has been fully compensated may nevertheless seek recovery from the responsible party if it does so to enforce an insurer's subrogation rights.[15] *Anheuser-Busch, Inc. v. Starley,* 28 Cal.2d 347, 351–52, 170 P.2d 448 (1946); *Greene v. M & S Lumber Co.,* 108 Cal.App.2d 6, 11, 238 P.2d 87 (1951); *Lebet v. Cappobiancho,* 38 Cal. App. 2d Supp. 771, 102 P.2d 1109 (1940); *see also Progressive West Ins. Co.,* 135 Cal.App.4th at 273, 37 Cal.Rptr.3d 434 (when insurer has subrogation right, it can either interplead itself into the suit brought by the insured against the wrongful third party "or wait to seek reimbursement under the language of its policy from

15. Access asserts in its reply that the question of who is the real party in interest in the instant action for recovery of the reinsurance payments is resolved by the choice of law provisions in the reinsurance contracts. Access has cited no authority for this proposition nor has the court discovered any. Access's position is particularly confused since, in its motion, Access relied on California law and expressed to the court that "it is not necessary for this Court to analyze choice of law" on this issue. Mot. for Summ. J. at 31 n. 9.

the insured to the extent that the insured recovers money from the third party").[16]

Although the collateral source rule has been held inapplicable to actions for breach of contract, *Plut v. Fireman's Fund Ins. Co.*, 85 Cal.App.4th 98, 107–109, 102 Cal.Rptr.2d 36 (2001), that exception seem inappropriate here. In *Plut*, the court held that plaintiff could not receive a damages award for breach of contract against his insurance company when he had already received more than the amount of damages he sought from his settlement with the defendant in a separate, but factually related, suit. 85 Cal. App.4th at 107–109, 102 Cal.Rptr.2d 36. To hold otherwise would permit the plaintiff double recovery, which the court considered antithetical to the purpose of a damage award for breach of contract, which is to make the plaintiff whole. *Id.*

▉▉▉ Here, that concern is not present. The agreement between Lincoln and its reinsurers (the clash reinsurance agreement) required Lincoln to seek reimbursement "on account of claims and settlements involving reinsurance hereunder" and to enforce this right for the purpose of reimbursing the reinsurers.[17] Depo. Exhibit 77 In Support of Pl.'s Opp. to Mot. for Summ. J. at 8. Similarly, in its Quota Share Reimbursement Agreement with Kingsway Reinsurance Corporation, Lincoln agreed to reimburse Kingsway for any recovery Lincoln obtained, "in proportion to [the parties'] respective interest in the loss." Depo. Exhibit 121 In Support of

Pl.'s Opp. to Mot. for Summ. J. at 11. Consequently, since California law permits the insured to seek recovery on behalf of its insurer in the insured's name, *see, e.g., Lebet*, 38 Cal.App.2d Supp. at 773, 102 P.2d 1109, and if Lincoln is required to reimburse its reinsurers for any recovery it obtains, Lincoln should not be barred from recovering an amount at least equal to that which it has received by its reinsurers.

## 2. Lincoln's Loss Portfolio Transfer Agreement

▉▉▉ Access argues that Lincoln cannot recover because it has already been reimbursed for its losses under a Loss Portfolio Transfer Agreement (LPTA), a type of reinsurance agreement, with Kingsway Reinsurance Corporation. Lincoln disputes that it has been reimbursed under the LPTA.

Access has tendered deposition testimony from Lincoln's Chief Financial Officer, Gary Orndorff, to establish that Lincoln has been fully reimbursed through the LPTA for its settlement with the Diases and the costs of defending Coleman.[18] In his deposition, however, Orndorff did not testify that Lincoln had in fact received reimbursement under the LPTA for the Dias settlement and costs of defending that suit. *See* Orndorff Depo. at 36:13–21. In fact, he specifically stated that he was not aware of the amount that Lincoln was reimbursed under the LPTA for the Dias settlement and defense expenses related to

---

16. Lincoln also cites *Employers Mut. Liab. Ins. Co. v. Tutor–Saliba Corp.*, 17 Cal.4th 632, 639, 71 Cal.Rptr.2d 851, 951 P.2d 420 (1998), for this rule. That case appears inapplicable, as its holding was based on California's workers compensation statute.

17. Although Access observes that this agreement is governed by Illinois law and if Illinois law in fact applies, *see* note 12 *supra*, Access

offers no authority under Illinois law that would bar the reinsurers from assigning their rights to recovery to Lincoln, as it appears was done here.

18. Access has not tendered the LPTA because it did not obtain it in discovery. *See* Access's Ex parte Application to Reopen Time to File Discovery Motions, Oct. 10, 2008.

that suit. *Id.* Later in the deposition, Orndorff responded to questions about reimbursement of Lincoln's reinsurers were Lincoln to recover in the instant suit and Orndorff confirmed that any recovery would go entirely to Lincoln's reinsurers, under either the reinsurance agreements discussed *supra* or the LPTA. *Id.* at 40:16–41:6. Orndorff has since declared that Lincoln has not been reimbursed under the LPTA.[19] Orndorff Decl. ¶ 3.

In light of the evidence tendered, the court is not persuaded that Lincoln has been reimbursed through the LPTA for its settlement payment and costs for defending against the Dias suit. Orndorff's deposition testimony alone does not establish this as his testimony may be understood to describe generally the reinsurance agreements Lincoln has entered in relation to both the Dias suit and the instant suit.

19. Orndorff's additional statements describing the contents of the LPTA are inadmissible under the best evidence rule. *See* Fed. R. of Evid. 1002.

20. Even if it were, as the court explained *supra*, there appears no legal impediment to

The inferences Access has drawn from the deposition testimony are contradicted by Orndorff's subsequent declaration. Taken together, the court cannot conclude that there is no genuine issue of material fact that Lincoln has been fully reimbursed for the recovery it seeks.[20]

## IV. CONCLUSION

For the reasons stated herein, defendant's motion is GRANTED IN PART as described *supra*. It is DENIED in all other respects.

IT IS SO ORDERED.

Lincoln seeking recovery from Access for the purpose of vindicating its reinsurers' interests.